RONALD LEE DANIEL *v.* COMMISSIONER OF CORRECTION
(AC 18250)

Foti, Mihalakos and Healey, Js.

Argued October 25, 1999—officially released May 16, 2000

*Adele V. Patterson*, deputy assistant public defender, with whom was *Temmy Ann Pieszak*, assistant public defender, for the appellant (petitioner).

*Carolyn K. Longstreth*, senior assistant state's attorney, with whom, on the brief, were *Patricia A. Swords*, state's attorney, and *John Dropick*, former assistant state's attorney, for the appellee (respondent).

*Opinion*

HEALEY, J. The petitioner, Ronald Lee Daniel, has taken this appeal from the judgment of the habeas court dismissing his amended petition for a writ of habeas corpus in which he made four claims challenging the legality of his confinement. On appeal, the petitioner claims that the habeas court acted improperly (1) in finding that the record established that his plea of guilty was knowing, intelligent and voluntary,[1] (2) in rejecting

---

[1] The respondent, the commissioner of correction, claims that the petitioner's objection to the plea canvass was clearly defaulted because he did not move to withdraw his guilty plea in the trial court and did not challenge the adequacy on appeal. The petitioner disagrees, arguing that such a claim of default was never made by the respondent in the habeas court. The respondent does not claim that it was raised in the habeas court. Further, in deciding whether the respondent did actually raise such a claim in the habeas court we are also disadvantaged by the fact that the respondent did not file a posttrial brief with that court. Under these circumstances, we cannot say that the respondent has shown that there is a procedural defect affecting our review of the trial court's canvass of the petitioner's guilty plea, and we will review that canvass.

his claim that he was denied the effective assistance of counsel in the underlying criminal proceeding, and (3) in rejecting his claim that the trial court and the trial court clerk deprived him of his right to appeal.[2] We affirm the judgment of the habeas court.

The petitioner was arrested in March, 1988, and charged under General Statutes § 53a-54a with the March 19, 1988 murder of Marcel Malcolm. Attorney Michael A. Peck was retained on March 20, 1988, to represent him. On May 27, 1988, the petitioner was scheduled for a probable cause hearing on the murder charge. On that date, Peck informed the court that the probable cause hearing was being waived and requested the court to make a finding of probable cause preliminary to the petitioner's entering a plea to the murder charge. After the court, *Kline, J.*, inquired of the petitioner concerning Peck's statement, the court made a finding that probable cause existed to prosecute the petitioner for murder under § 53a-54a. On May 27, 1988, the petitioner entered a plea of not guilty to the charge of murder and elected a jury trial. On July 14, 1989, however, the petitioner entered a plea of guilty, and, following a plea canvass, the trial court, *Norko, J.*, accepted his guilty plea and made a finding of guilty. The petitioner's guilty plea was entered pursuant to an agreement that assistant state's attorney Warren Maxwell would recommend a sentence of forty years. At

The respondent apparently recognizes his problems in urging that we deny review on his foregoing procedural default claim because, in his brief, he argues "alternatively" that the canvass was adequate and he briefs that claim at some length. In any event, we will review the adequacy of the canvass of the guilty plea.

[2] In the habeas court, the petitioner claimed that he was denied a fair trial by the late disclosure of exculpatory evidence. That court rejected that claim, stating that "the petitioner failed to establish his burden of proof that his decision to plead guilty resulted from the state's failure to provide timely disclosure of exculpatory information." The petitioner does not press this claim on appeal.

the time of his plea, the petitioner, upon inquiry of the court, stated that he felt Peck had been effective in representing his interests and that he knew of no reason why the court should not accept his plea. On August 31, 1989, the court imposed a total effective sentence of forty years.

## I

We first take up the claim that the habeas court acted improperly in finding that the petitioner's plea canvass was adequate to demonstrate a knowing, intelligent and voluntary guilty plea.[3] On appeal, the petitioner objects

---

[3] We note that the second count of the amended petition goes to the petitioner's claim that the habeas court acted improperly in holding that the record established a knowing, intelligent and voluntary guilty plea. The respondent filed a return to all counts of the petition.

"Habeas corpus is a civil proceeding." *Collins* v. *York*, 159 Conn. 150, 153, 267 A.2d 668 (1970). It is a legal and not an equitable remedy. *Epps* v. *Slavin*, 9 Conn. Sup. 460, 468 (1941); 39 C.J.S. 461, Habeas Corpus § 3 (1976). The application for a writ of habeas corpus is regarded as a pleading in the nature of a complaint; *Arey* v. *Warden*, 187 Conn. 324, 332, 445 A.2d 916 (1982); *Evans* v. *Santoro*, 6 Conn. App. 707, 710 n.2, 507 A.2d 1007 (1986); and the return in the nature of an answer. *Evans* v. *Santoro*, supra, 710 n.10. The pleadings in this case are so framed and when issue is joined the evidence must be relevant to those issues. *Arey* v. *Warden*, supra, 332. When our rules speak of the "legal grounds" upon which the petition is based, "ground must mean a sufficient legal basis for granting the relief sought." (Internal quotation marks omitted.) *Negron* v. *Warden*, 180 Conn. 153, 158, 429 A.2d 841 (1980).

In examining the twenty-seven allegations of the second count, we note that that count is not grounded on the effective assistance of counsel but rather on the improper action of the trial court in its canvass of the petitioner at the time of his guilty plea. That is the manner in which the habeas court construed the second count in deciding the ground of an improper canvass. The respondent is correct when he states that the petitioner has neither alleged nor briefed this claim "under the rubric of ineffectiveness of counsel." The allegations set the parameters for the evidence that may be adduced to obtain the relief justified thereunder.

The fact that one paragraph of the second count alleges that "defense counsel did not inform the petitioner of his right to appeal the validity of his guilty plea" does not change our view. This paragraph is incorporated, word for word, from the first count, which alleges in fifty-two paragraphs the ineffectiveness of counsel. Fairness, in reviewing the habeas court's action on the second count, leads us to treat it for what it is: a challenge to the trial court's canvass.

to the trial court's (1) dismissing as "insignificant" his objection to certain of the facts proffered by the prosecutor at the time of the plea, (2) statement that "the only thing that mattered, [was] the 'gravamen' of the offense [which was] the act of pulling the trigger" and (3) failure to advise him of the intent element of the crime of murder under § 53a-54a.

"A guilty plea . . . that is not both voluntary and knowing is in violation of due process and thus void. *McCarthy* v. *United States*, 394 U.S. 459, 466, 89 S. Ct. 1166, 22 L. Ed. 2d 418 (1969); *State* v. *Lopez*, 197 Conn. 337, 341, 497 A.2d 390 (1985). For a guilty plea to be truly voluntary, the defendant must understand the law in relation to the facts. *McCarthy* v. *United States*, supra, 466. Moreover, since a defendant waives several constitutional rights when he elects to plead guilty to a criminal offense, the choice of a guilty plea is of profound significance. *Boykin* v. *Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969); *State* v. *Childree*, 189 Conn. 114, 120, 454 A.2d 1274 (1983). In pleading guilty, a defendant waives his privilege against compulsory self-incrimination, his right to trial by jury and his right to confront his accusers. *Boykin* v. *Alabama*, supra [243]; *State* v. *Lopez*, supra [341]; *State* v. *Childree*, supra [120]; see Practice Book § 711 (5) [now § 39-19 (5)]. A guilty plea, therefore, is constitutionally valid only if the record affirmatively discloses that the plea was entered voluntarily and intelligently. *Boykin* v. *Alabama*, supra, 242; *State* v. *Lopez*, supra [342]; *State* v. *Marra*, 174 Conn. 338, 340, 387 A.2d 550 (1978); *Blue* v. *Robinson*, 173 Conn. 360, 373, 377 A.2d 1108 (1977)." *Oppel* v. *Lopes*, 200 Conn. 553, 556, 512 A.2d 888 (1986). A guilty plea may satisfy constitutional requirements even in the absence of literal compliance with the prophylactic safeguards of Practice Book §§ 31-19 and 31-20, respectively. *State* v. *Badgett*, 200 Conn. 412, 418, 512 A.2d 160, cert. denied, 479 U.S. 940,

107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); *State* v. *Alicea*, 41 Conn. App. 47, 55, 674 A.2d 468 (1996). "A 'determination as to whether a plea has been knowingly and voluntarily entered entails an examination of all of the relevant circumstances.' *State* v. *Wright*, 207 Conn. 276, 287, 542 A.2d 299 (1988)." *State* v. *Garvin*, 242 Conn. 296, 310, 699 A.2d 921 (1997).

## A

We do not agree that at the time of taking[4] the petitioner's guilty plea, the trial court dismissed as "insignificant" his objection to certain facts proffered by the prosecutor. When the prosecutor presented the factual basis for the plea, he recited the following: "The [petitioner] and the victim had been engaged in illegal business activities, and a dispute erupted over the—a debt of four hundred dollars, which the victim claimed [the petitioner] owed him. . . . What happened was there was a prearranged meeting between [the petitioner] and the victim to meet on Lyme Street in Hartford. The victim arrived there in a white Nissan. In the car with him was one of the state's witnesses [Robert Gordon]. . . . Earlier that day, [the petitioner] had called another state's witness by the name of Mark Osborne. Now, Mr. Osborne was the owner—and I believe legitimate owner—of a shotgun. . . . [The petitioner] called Mr. Osborne, told him he wanted to borrow his rifle. [When] Osborne inquired why he wanted it, [the petitioner] responded that he wanted to—he was going to meet with the victim and he wanted to scare him. There was no indication it was going to be used other than to scare the victim. Osborne consented to its use for that purpose. [The petitioner] went to Tower Avenue, where Osborne lived, and was greeted by Osborne, who had the shotgun in a box in the first floor of that apartment

---

[4] The taking of the defendant's guilty plea by the trial court covers sixteen pages of transcript.

[with] some twelve gauge shotgun shells. And he delivered possession of that weapon and the—some shells to [the petitioner], who promptly put it into the pant leg of a sweat suit he was wearing. He invited Osborne to join him, and Osborne said he would. The two of them proceeded to walk west of Tower Avenue toward Lyme Street. As they were walking on Lyme Street, an RX-7 Mazda pulled up—stolen. Another man by the name of [Robert Grant] was driving that car. Both of these parties got into the Mazda and proceeded . . . to Lyme Street. When they got there, they saw the white Nissan parked and they knew the victim was in it. Both Osborne and [the petitioner] exited the Mazda and proceeded to walk toward the white Nissan. The RX-7, with [Grant] driving it, left. At this point, the passenger in the victim's car got out of the white Nissan, went around to the passenger side, off to the side of it. The other two continued to approach the car. At this point, [the petitioner] went to the car window. Both witnesses . . . then saw [the petitioner] unzip his jacket, remove the shotgun from the pant leg, point it into the window, [make] some threatening comment, and [say] he had five seconds and proceeded to count a down count— five, four, three, two and then fired point blank at close range with that shotgun, striking the victim in the face. He racked the shotgun, fired a second time, striking the trachea, racked the shotgun, fired a third time, striking the left shoulder area. The body was torn apart. The witnesses were shocked, they never thought this was going to happen. Right after the shooting occurred, the Mazda returned. Now all three of them get into the Mazda and they leave the scene."

Upon inquiry by the trial court, the prosecutor also informed the court that the $400 debt referred to arose out of an ongoing arrangement whereby the petitioner would sell drugs for the victim, and the petitioner failed to remit $400 to the victim. At that time, the prosecutor

also informed the court that Osborne and the passenger in the Nissan were available to testify against the petitioner, but that Grant was unavailable because criminal charges were pending against him arising from the same incident.[5]

At that point, the trial court made the following inquiries of the defendant and received the following responses:

"The Court: Thank you, Mr. Maxwell. Mr. Daniel, the facts indicated by the state on the record—you've [pleaded] guilty to murder before this court, based upon the recitation of Mr. Maxwell of the facts, do you dispute any of the facts as indicated by the state on the record?

"The [Petitioner]: What I just heard?

"The Court: Yes.

"The [Petitioner]: Yes, I do.

"The Court: Which facts do you dispute, sir?

"The [Petitioner]: That's not what happened.

"The Court: Now, you're being charged with murder, you've just [pleaded] guilty to murder. And the gravamen obviously is the moment when, according to the state, you shot the victim here on three—three different occasions. Are those facts accurate?

"The [Petitioner]: Yes.

"The Court: So you did have the shotgun in your hand, the facts as far as the state has alleged on the record of shooting the victim here, [racking] the gun

---

[5] Grant was found guilty after a jury trial of the crime of accessory to murder in violation of General Statutes §§ 53a-54a and 53a-8 and was sentenced to twenty-five years in prison. On appeal, our Supreme Court affirmed the judgment of conviction. *State* v. *Grant*, 219 Conn. 596, 594 A.2d 459 (1991).

after the first time two other times—you shot him three times?

"The [Petitioner]: Yes.

"The Court: All right. Now, as far as the factual basis which you dispute, tell me about that.

"The [Petitioner]: As far as what happened between me and [Osborne], and [Gordon], the witness who was in the white [Nissan], that's not true.

"The Court: Explain further, what do you mean it's not true? Why isn't it true?

"The [Petitioner]: As far as—I mean, what happened, or is it just—

"The Court: Tell me. Sure.

"The [Petitioner]: The call that Robert Gordon got, he didn't get a call from me telling him to meet me on Lyme Street. As far as Mark Osborne telling me about the gun and I'm inviting him along, I didn't invite [Osborne] anywhere.

"The Court: He just came along?

"The [Petitioner]: Just came.

"The Court: Is there anything else you dispute about the facts?

"The [Petitioner]: No."

The petitioner argues that the trial court "dismisses" his objections to the recited facts as "insignificant in the face of the later reading of the murder [statute], including the element of intent to kill." He maintains that the trial court's response to his dispute with the factual basis "was to inform him that the only thing that mattered, the 'gravamen' of the offense was the pulling of the trigger" and that he was not informed that the court intended to draw an inference to cause

death from *that* factual basis.[6] He claims also that the "defect" in the plea is not overcome by the trial court's reading of the murder statute.

In context, it is not quite correct for the petitioner to argue that the court dismissed his objection as insignificant in the face of its later reading of the murder statute. In making this argument, the petitioner does not analyze the quality of his objections in the first instance with reference to the matter at hand, i.e., his plea to murder. The state's proffer said that the petitioner invited Osborne to join him. The petitioner denied this, saying that he "didn't invite [Osborne] anywhere." That is a wholly peripheral matter; it is not material to the validity of the canvass. The state's second proffer that the petitioner disputes is of the same quality, i.e., that Gordon got a call from the petitioner to meet him on Lyme Street. Parenthetically, the prosecutor, at the time of the plea, informed the trial court that Gordon, who observed "this whole thing," was not even arrested and was prepared to testify for the state in this case. Moreover, after the court listened to the petitioner on his "dispute" as to the facts, the court then asked him, "Is there anything else you dispute about the facts?" and the answer was, "No." Even if we assume that the petitioner was correct in the two instances of "dispute" to which he refers, the recitation of the facts by the prosecutor still provided a valid factual basis for the plea of guilty.

## B

The petitioner's allusion to the trial court's use of the term "gravamen" as somehow misleading him lacks merit. Again, when this "gravamen" language is read in context, coming as it does after the prosecutor's long recitation of the proffered factual basis of the charge of murder, it is clear that the court is directing the

---

[6] The petitioner cites no authority for the proposition.

petitioner's attention to the most material[7] part of the charge so that the court can determine whether these facts were also in dispute. The use of the term "gravamen" cannot fairly be said to be misleading. It directed his attention to facts that directly implicated his intent. The petitioner's claim that "he was not informed that the court intended to draw an inference to cause death from that factual basis," including the "gravamen," is advanced as going to the validity of his plea. That argument lacks merit. "The description of the charges need not come directly from the court so long as the record reveals that the defendant understood them. . . . If, during the plea colloquy, the [state's] statement or the defendant's own version of the facts sets forth all elements and conduct of the offense, admission to that conduct sufficiently establishes the defendant's understanding of the charge." (Citation omitted.) *United States* v. *Martinez-Martinez*, 69 F.3d 1215, 1220 (1st Cir. 1995), cert. denied, 517 U.S. 1115, 116 S. Ct. 1343, 134 L. Ed. 2d 492 (1996). Here, not only does the state's proffer satisfy this requirement, but it is buttressed by the petitioner's agreement with it, keeping in mind that his "dispute" with it was with two immaterial aspects.

C

In addition, the petitioner claims that the "defect" in his plea was not "overcome" by the trial court's reading the murder statute. It is not required, however, that the trial court read the charging statute to the petitioner if there are other reasons to believe that the petitioner understands that statute. *State* v. *Wideman*, 38 Conn. App. 581, 586, 663 A.2d 409, cert. denied, 235 Conn. 907, 665 A.2d 906 (1995). Moreover, the court did read the murder statute, which included the element of intent.

---

[7] Webster's defines the noun "gravamen" to mean "the material part or basis of (as of a grievance or charge)." Webster's Third New International Dictionary.

The court, after reading the statute and having before it the petitioner's admission to the strong factual basis for the crime charged, made the specific finding that the petitioner "has admitted the factual basis, specifically the factual basis constituting the murder." The court knew also, after its inquiry, that the petitioner had had no drugs, alcohol or medicine that day, and that no notice of mental disease or defect had been filed.[8]

In canvassing the matter with the petitioner, the trial court must make sure that he had a full understanding of what the plea connotes and of its consequence. *Boykin* v. *Alabama*, supra, 395 U.S. 244. We are aware that although a guilty plea is an admission of all the elements of a formal criminal charge, it still is not truly voluntary unless the defendant can be said to possess an understanding of the law in relation to the facts. *McCarthy* v. *United States*, supra, 394 U.S. 466.

The record here justifies the conclusion that the petitioner's plea was knowing, intelligent and voluntary. On the guilty plea, the court had the authority to draw the inference of intent; it properly did so here. Our Supreme Court has stated that "[o]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill. . . . *State* v. *Holley*, 174 Conn. 22, 26, 381 A.2d 539 (1977). . . . *State* v. *Stanley*, 223 Conn. 674, 680, 613 A.2d 788 (1992)." (Internal quotation marks omitted.) *State* v. *Mejia*, 233 Conn. 215, 225, 658 A.2d 571 (1995). This is one such instance, given, inter alia, the shooting of

---

[8] In addition, at the time the petitioner pleaded guilty on July 14, 1989, he was nineteen years old, having been born on September 7, 1969. He had already graduated from high school. See *Marshall* v. *Lonberger*, 459 U.S. 422, 428–29, 437, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983). Shortly before his guilty plea on July 14, 1989, the petitioner had pleaded guilty to a larceny charge.

three twelve gauge shotgun shells into the victim from a pistol-grip shotgun at close range by the petitioner, who had borrowed the shotgun, carried it concealed to the scene of the homicide, told the victim that he had five seconds and then racked the shotgun three separate times, killing the victim. We conclude that the habeas court properly decided that the plea canvass was adequate and that the petitioner's plea was knowing, intelligent and voluntary.

## II

We now take up the petitioner's claim that the habeas court acted improperly in rejecting his claim that he was denied the effective assistance of counsel in the underlying criminal proceeding. Included in this claim are the petitioner's arguments that the habeas court acted improperly in that it used a subjective standard to decide whether he had proven actual prejudice under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and that the habeas court should have concluded that he had proven actual prejudice in that it was reasonably likely that there would have been a different outcome absent the ineffective assistance of counsel. He claims specifically that he proved actual prejudice from his counsel's failure to investigate the facts and to understand the law not only prior to entry of his guilty plea but also at the time of entry of his guilty plea. We disagree.

"Whether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Quintana* v. *Commissioner of Correction*, 55 Conn. App. 426, 435–36, 739 A.2d 701, cert. denied, 252 Conn. 904, 743 A.2d 614 (1999).

Initially, we recognize that "[a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, supra, 466 U.S. 686. . . . Pretrial negotiations implicating the decision of whether to plead guilty is a critical stage . . . and plea bargaining is an integral component of the criminal justice system . . . ." (Citations omitted.) *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 153, 662 A.2d 718 (1995).

For a criminal defendant to prevail on a constitutional claim of ineffective assistance of counsel, he must establish both (1) deficient performance and (2) actual prejudice. *Phillips* v. *Warden*, 220 Conn. 112, 132, 595 A.2d 1356 (1991). Thus, he must establish not only that his counsel's performance was deficient, but that as a result thereof he suffered actual prejudice, namely, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* v. *Washington*, supra, 466 U.S. 694. In this context, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," does not require the petitioner to show that "counsel's deficient conduct more likely than not altered the outcome in the case." Id., 693. "Rather, it merely requires the petitioner to establish 'a probability sufficient to undermine confidence in the outcome.' Id., 694."[9] *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 445–46, 610 A.2d 598 (1992).

"In *Hill* v. *Lockhart*, [474 U.S. 52, 57–58, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)], the court determined that

---

[9] The respondent has not challenged the habeas court's finding that "counsel's representation was inadequate." Therefore, only the second prong of the *Hill-Strickland* standard regarding the prejudicial assistance of counsel is at issue here. See *Hill* v. *Lockhart*, 474 U.S. 52, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985).

the same two-part standard applies to claims arising from the plea negotiation process and that the same justifications for imposing the prejudice requirement in *Strickland* were relevant in the context of guilty pleas. Although the first half of the *Strickland* test remains the same for determining ineffective assistance of counsel at the plea negotiation stage, the court modified the prejudice standard. As in *Strickland*, the prejudice standard for plea negotiations is intended to determine whether, but for counsel's constitutionally deficient performance, the outcome of the plea process would have been different. The court went on to require that in order to satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. Id., 59." (Internal quotation marks omitted.) *Copas* v. *Commissioner of Correction*, supra, 234 Conn. 156. The *Hill* court, in discussing the "prejudice" inquiry in guilty plea cases, indicated that the assessment of whether an "ineffective" counsel may have "deprived" a petitioner "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Hill* v. *Lockhart*, supra, 59. It went on to state that "[a]s we explained in *Strickland* . . . these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.'" Id., 59–60.[10]

---

[10] An examination of that portion of *Strickland* concerning the "idiosyncracies" allusion by the Supreme Court in *Hill* gives some indication of how the court used that term. The *Strickland* court stated: "In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is

## A

The petitioner, while agreeing that the habeas court quoted correctly in its decision "the objective standard [for prejudice] set out in *Strickland, Hill* and *Copas*," argues that when the court ruled on prejudice, it did so solely by reference to its own confidence in the outcome, refusing to predict by reference to a jury. He claims that by allegedly doing so, the habeas court was substituting its own reaction to the evidence for that of the hypothetical jury, "thus erroneously applying a subjective measure of the evidence on the question of prejudice." We do not agree.

"We . . . examine the trial court's memorandum of decision to understand better the basis of its decision and to determine the reasoning used by it in reaching its conclusion." *Barra* v. *Ridgefield Card & Gift Gallery, Ltd.*, 194 Conn. 400, 404, 480 A.2d 552 (1984). The petitioner states that the habeas court acted improperly when it stated, "[i]t is not the court's function to speculate whether the proffer, at trial, of the evidence adduced at the habeas trial might have affected the factual decision makers, but rather, whether there is a sufficient probability of a different outcome so as to undermine the court's confidence in the judgment of guilt." Any fair discussion of this contention must be put in context by considering the sentence that precedes the challenged sentence as well as the sentences that follow it. The preceding sentence states: "While habeas counsel has diligently presented evidence to suggest areas of reasonable doubt, including forensic evidence concerning the victim's gunshot wounds, opinion evidence regarding the trajectory and distance from which the mortal shots were fired, inconsistent statements from

reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency." *Strickland* v. *Washington*, supra, 466 U.S. 694–95.

witnesses, and information concerning the victim's propensity for violence, the court is unpersuaded that there is a reasonable likelihood that the cumulative effect of this evidence would have resulted in a different verdict, had the petitioner chosen to go to trial."

The sentences following the challenged sentence state: "Given the operative physical facts of this shooting, combined with the availability of witness testimony consistent with the state's theory of the case, the court is unpersuaded that there is a reasonable probability that a trial would have resulted in a more beneficial outcome to the petitioner. Counsel's failures do not undermine the court's confidence in the court's judgment of guilt." It is apparent from a reading of the challenged sentence in context that the habeas court, having earlier laid out the controlling law, did not apply a subjective standard as claimed, but rather applied the operable legal standard. Even in the challenge, the court correctly speaks of the requirement of the existence of a probability of a different outcome so as to undermine the court's confidence in the judgment of guilt. That, the habeas court stated, is its function. The preceding sentence states that the court is "unpersuaded" of a "reasonable likelihood" of a "different verdict" had the petitioner chosen to go to trial, again invoking applicable legal principles. The sentence following the challenged sentence states again that it is "unpersuaded" that there is "a reasonable probability that a trial would have resulted in a more beneficial outcome to the petitioner," again applying correctly the relevant law. Finally, the next sentence concludes that the failures of counsel at the entering of the guilty plea "do not undermine the court's confidence in the court's judgment of guilt."

The petitioner, in his "subjective standard" claim, suggests that the habeas court ran afoul of the *Hill* and *Strickland* courts that the "predictions" on the

prejudice aspect should be made objectively without regard for the " 'idiosyncracies of the particular decisionmaker.' " *Hill* v. *Lockhart,* supra, 474 U.S. 59–60; *Strickland* v. *Washington,* supra, 466 U.S. 695. The contention lacks merit. The petitioner has not proven any "idiosyncracy" as that term appears to be perceived by the *Hill* and *Strickland* courts. We conclude that the habeas court applied properly the objective standard to decide whether the petitioner had proved prejudice.

### B

Next, the petitioner claims that the habeas court improperly found that he had not proven actual prejudice after it found that counsel's representation was inadequate. To obtain relief under the *Strickland* test on a constitutional claim of ineffective assistance of counsel, the petitioner must meet both "deficient performance" and "actual prejudice." *Jenkins* v. *Commissioner of Correction,* 52 Conn. App. 385, 393, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999); see *Bunkley* v. *Commissioner of Correction,* supra, 222 Conn. 445. Here, the habeas court[11] found that his counsel's representation was inadequate, finding specifically that counsel had essentially conducted no investigation, spoke to no witnesses, did not speak with the medical examiner or with any forensic expert relating to the gunshot wounds or other physical aspects of the shooting, and did not pursue the question of whether the petitioner was drug-dependent at the time of the

---

[11] The habeas court did find that petitioner's counsel interviewed the petitioner and the petitioner's mother. Although the habeas court's decision referred to what the petitioner's counsel did and did not do, such discussion did not cover all the allegations of ineffectiveness. We note that the habeas court made no finding whether counsel explained the element of intent. In that regard, the transcript discloses that the petitioner's counsel, at the entering of his guilty plea, testified in the habeas court that he "would have" gone over the elements of murder with the petitioner and that he did explain to the petitioner what the state would have to prove at a trial.

offense. In finding that counsel's performance was inadequate, the habeas court referred to it as "superficial."

The matter, however, does not end there because, according to the aforementioned *Strickland* test, the petitioner now must prove actual prejudice. To this end, the petitioner argues that counsel failed to investigate the facts adequately and to advance valid defenses. We will examine these claims in turn.

1

An examination of the transcript of the proceedings in the habeas court discloses that petitioner's counsel,[12] in that court, presented testimony from the petitioner's counsel in the underlying criminal proceedings, the petitioner's mother, certain Hartford police officers, forensic experts, an attorney expert, the prosecutor who was

---

[12] No one who allegedly was a witness to the shooting and from whom statements had been taken by police actually testified, although statements of some persons who actually witnessed the shooting were in evidence as exhibits.

The petitioner himself did not testify. He did, however, introduce as exhibits two documents. One was contained in the "officer's version" portion of the presentence investigation, which was prepared after the acceptance of the petitioner's guilty plea. There he claimed that Osborne owed him money which he, in turn, was going to use to pay his debt to the victim. The petitioner mentioned that Osborne had offered him his shotgun in payment of his debt to the petitioner. He maintained that at the prearranged meeting with the victim, the victim told him to get into his car and he then thought that the victim was going to kill him. Contending that he was "frightened, intoxicated on cocaine and under pressure," the petitioner shot the victim.

The second document was an affidavit prepared by the petitioner after the initiation of his habeas corpus proceeding. In this document, the petitioner contended that he was a "middleman" between Osborne and the victim, that he told the victim that he had "five seconds to leave," that the victim laughed and reached for the glove compartment, and, that after the first shot, the victim continued reaching and retrieved a gun and faced the petitioner at which time the petitioner shot the victim in the face.

According to the medical examiner who performed the autopsy, all three shots fired by the petitioner entered the victim. In addition, there was no gun found by the police in the victim's car.

present at the time of plea and sentencing, the physician who performed the autopsy on the victim, and a psychiatrist and certain lay testimony. A large number of exhibits were also admitted into evidence.

Reference to proceedings in the habeas court and evidence presented there is helpful on this branch of the case. The statements of Osborne and Gordon, consistent with the state's case, disclose the following.[13] At 5:45 p.m. on March 19, 1988, the petitioner called Osborne and asked to borrow Osborne's shotgun. At first Osborne refused. About one-half hour later, the petitioner called again and repeated his request. When asked why he wanted to do so, the petitioner said that he and "Robert" wanted to use it to scare someone and would not shoot it. He also told Osborne that he was tired of owing money to this person, was not going to pay him anymore and was going to stab him. Thereafter, he went to Osborne's home where Osborne handed the shotgun together with three rounds of shells to the petitioner who, thereupon, stuffed the shotgun down his pant leg and put the shells in his pocket. Osborne and the petitioner then started walking to Lyme Street where the petitioner had told Osborne that he was to meet the person in question. On the way there, a Mazda, operated by Grant, drove up. The petitioner signaled the Mazda, it stopped, and the petitioner and Osborne got in. The petitioner told the driver, "Rob, we have to hurry up."

Gordon knew that the petitioner used and sold cocaine supplied by the victim. Earlier on the night of

---

[13] Among other things, the state's file was introduced into evidence. It contained documents prepared during the police investigation of the homicide, the prosecution of the petitioner's case, the trial of Grant and various posttrial proceedings pertaining to Grant. Specifically, it also included the statements by Osborne, Gordon, Cornell Wright and Bernard Hampton, character evidence of the victim, transcripts of Grant's probable cause hearing and trial, and certain physical evidence.

March 18, the petitioner had called Gordon telling him that the victim would pick up Gordon at his house and that Gordon was to tell the victim how to get to Lyme Street. The victim arrived at Gordon's house in a white Nissan. When Gordon and the victim got to Lyme Street, Gordon got out of the Nissan on the passenger side. The petitioner, who was already standing on Lyme Street with Osborne, walked around the Nissan and approached the driver's door. While Osborne and Gordon remained by the passenger's door, Osborne heard the petitioner tell the driver in a loud voice, "I'm not giving you any more money; I'm tired of giving you money." Then both Osborne and Gordon saw the petitioner pull the shotgun out of his pants. He then told the victim, "you have five seconds, don't move." After counting down, "five, four, three, two, one" the petitioner fired the shotgun into the car. He racked the shotgun and fired a second round, then racking it again, he fired a third round. In all, the petitioner fired three shots into the Nissan.

Immediately after the shooting, the Mazda, operated by Grant, reappeared at the scene. The petitioner got in the passenger side of the Mazda, having thrown the gun into the car. Grant told the petitioner to check the victim's body for drugs and cash. After the petitioner did this, Grant drove the petitioner and Osborne away from the scene and dropped them off separately a few blocks from the scene. Later, the petitioner called Osborne and told him to wipe the fingerprints off the shotgun, which he did.

The petitioner argues that this version of the shooting offered by statements of Osborne and Gordon is not reliable. Moreover, he appears to claim that the following statements by Cornell Wright[14] and Bernard Hamp-

[14] The information attributed to Wright came from two incident reports, one compiled by Officer Stephen O'Donnell and the other prepared by Detective Nicholas Russo, both of the Hartford police department. Wright, O'Donnell and Russo did not testify at the habeas court proceeding.

ton are more probative, and that had counsel presented their testimony, the outcome of the plea process would have been different.

Wright, who resided in the Lyme Street neighborhood, said that he was looking out his living room window before the shooting when he saw a white Nissan occupied by two males pull up and park. He then saw a light blue hatchback arrive and the driver and a passenger get out. They approached the Nissan and "appeared to argue with the driver." In the meantime, the passenger in the white car had gotten out and had gone to the corner of Harold and Lyme Streets, which was nearby. Then Wright said that he looked away from the scene to look at his television. The next thing he heard was the male on the corner yell, "No," and Wright looked out and saw one of the males by the Nissan reach inside his jacket and pull out something. Wright then heard one shot and the male on the corner yelled, "No, no." Two more shots followed. The two males in the street jumped into the blue car, as did the male on the corner, and the blue car fled the scene. These three men were all black males and all wearing stonewashed jackets, jeans and sneakers. A second incident report compiled by Detective Nicholas Russo indicates that Wright said that he could not see which of the males was the shooter[15] because his view was blocked. In this report, Russo made the observation that Wright had been drinking although he was not intoxicated. At the trial, the petitioner argued that a supplemental report filed by Detective Madison Bolden of the Hartford police department[16] of his interview of Hampton sup-

---

[15] At the probable cause hearing in State v. Grant, 219 Conn. 596, 600, 594 A.2d 459 (1991), Wright testified that the driver of the Mazda had shot the victim. This was contrary to his earlier statement that he could not see which of the three men had fired a gun. Moreover, Wright admitted on cross-examination that it was dark at the time and that he had made his observations from a distance of 100 to 200 yards.

[16] On the date of the victim's murder, Bolden was a Hartford police detective. At the time of the habeas proceeding on this case he had retired from

ports his claims. According to Hampton, at about 7:45 p.m. on the night of the shooting, Hampton was visiting friends who lived on Lyme Street. He saw a small white car parked on that street. Three black males were leaning against the car with their backs to the driver's side. To him, these men "didn't appear to be arguing. They were just talking like old friends." He visited his friends for only a few minutes and the three men were still standing by the white car. Hampton could not see if anyone was seated in the white car. Hampton drove home, picked up something and returned to his friends' house on Lyme Street. When he returned, however, the police had the area marked off as a crime scene. Hampton's general description of the three men and their clothing were offered as similar to that given by Wright. Hampton, however, did not witness the shooting or what happened immediately thereafter.

Edward McDonough, the deputy chief medical examiner, performed the autopsy on the victim. He testified that the victim was shot three times—in the face, neck and left shoulder. It was his opinion that the shots were fired from about three to four feet from the victim.[17] It appears that the petitioner seems to argue that, given his alleged mental state of fear and pressure, as well as being "intoxicated on cocaine," the alleged reputation of the victim of often carrying a gun and the victim's alleged movement in his car as if reaching for a weapon, all these circumstances contributed to his firing the three shots at the victim. The petitioner sought through McDonough to demonstrate that the evidence of the movements of the victim, as those appeared to the petitioner under the circumstances, were such as to cause

the Hartford police department and was employed as an investigator with the public defender system. Bolden did appear and testify in the habeas court.

[17] Officer Regina Shephard of the Hartford police department was the one who first found the victim in the driver's seat of the white car. She reported that she found the window on the driver's side rolled almost all the way down.

him to protect himself. Despite the petitioner's arguments to the contrary, however, we determine, on the basis of the foregoing evidence, specifically, the witness' testimony that was consistent with the state's theory of the case, as well as the physical facts of the shooting as set forth by the deputy chief medical examiner's testimony, that the habeas court correctly found that the petitioner failed to demonstrate that there was a reasonable probability that but for counsel's errors, there would have been a more beneficial result for the petitioner.

2

We turn now to the petitioner's claim that a different and better outcome would have come about if his counsel had investigated and advanced the defense of justification (self-defense), which was a valid defense. This different outcome, he suggests, could be an acquittal by a jury, a conviction on a lesser included offense, a less severe sentence or an agreement by the prosecutor to reduce the nature of the crime charged down from murder.

"To evaluate such a claim properly, it is customary for the reviewing court to decide whether the affirmative defense at issue would have succeeded at trial. *Hill* v. *Lockhart*, supra, 474 U.S. 59; *Copas* v. *Commissioner of Correction*, [supra, 234 Conn. 162–63]. If it is likely that the affirmative [defense] of self-defense . . . would have succeeded at trial, then the petitioner has demonstrated the required prejudice to prevail on his ineffective assistance of counsel claim.

"When reviewing this claim, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under these circumstances, the challenged action might be considered sound trial strategy. . . . *Levine* v. *Man-*

*son,* 195 Conn. 636, 640, 490 A.2d 82 (1985)." (Internal quotation marks omitted.) *Constantopoulos* v. *Commissioner of Correction,* 47 Conn. App. 828, 836, 708 A.2d 588, cert. denied, 244 Conn. 927, 711 A.2d 726 (1998).

It is our law that under General Statutes § 53a-19 (a)[18] "a person may justifiably use *deadly* physical force in self-defense only if he *reasonably* believes *both* that (1) his attacker is using or is about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, *and* (2) that deadly physical force is necessary to repel such attack." (Emphasis in original.) *State* v. *Prioleau,* 235 Conn. 274, 285–86, 664 A.2d 743

---

[18] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

(1995). Our Supreme Court has stated that "the test [a trier of fact] must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a 'subjective-objective' one." Id., 286. This subjective-objective inquiry "requires that the [trier of fact] make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the [trier of fact] must determine whether, on the basis of all the evidence presented, the defendant in fact had [subjectively] believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . . [Second] if . . . the [trier of fact] determines that the defendant in fact had believed that the use of deadly force was necessary, the [trier of fact] must make a further determination [objectively] as to whether *that belief* was reasonable, from the perspective of a reasonable person in the defendant's circumstances." (Citations omitted; emphasis in original.) Id., 286–87. The trier of fact must resolve *both* of these questions in favor of a defendant to entitle him to the protection of § 53a-19. Of course, a defendant who acts as an initial aggressor[19] or as a person who responds with excessive force is not entitled to the protection of the defense of justification. See General Statutes § 53a-19 (a) and (c). "The defense of self-defense does not encompass a preemptive strike." *State v. Lewis*, 220 Conn. 602, 620, 600 A.2d 1330 (1991).

a

Here, the accounts of the shooting given to the police by Osborne and Gordon show that the petitioner was

[19] It has been said that "[t]he 'initial aggressor' is the person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used upon that other person. The first person to use physical force is not necessarily the initial aggressor." R. Leuba & R. Fracasse, Connecticut Selected Jury Instructions Manual (1998) § 2.40 (a), p. 106.

not only the initial aggressor but also the one who arranged circumstances of the shooting in advance. As the respondent, the commissioner of correction, argues, the petitioner told Osborne of his dislike for the victim and that he wanted to borrow Osborne's shotgun just to scare the victim and that he would not shoot it. Yet, in the petitioner's proffered "scare" scenario he not only obtained Osborne's shotgun but also three twelve gauge shotgun shells for it from Osborne. He had set up the meeting with the victim, and, using the ruse of an alleged repayment of his debt, engaged Gordon to guide the victim to the scene. He also told Osborne that he would present him to the victim as a potential drug buyer. In addition, the petitioner had loaded the shotgun before the victim arrived. This planning by the petitioner adduces a mentally culpable intent toward the victim's safety in preparing for a potentially legal confrontation.

Neither Osborne nor Gordon indicated that the victim said or did anything of an aggressive nature, although the victim did demand that the petitioner pay him the debt he was owed. The petitioner displayed the shotgun, issued his grim "five seconds" statement and shot the victim three times, having to rack the shotgun three times to do so.

The petitioner's evidence does not really address the initial aggressor issue. It endeavors to denigrate the statements of Osborne and Gordon, suggesting that their own circumstances, including their immunity status, contribute to compromising their credibility.[20] He does, however, point to the statement of Wright, arguing that it, supported by that of Hampton, does not support his conviction as the actual shooter but is "consistent

[20] While certainly not crucial here, we note that both Osborne and Gordon testified at trial substantially in accord with their statements to the police "about the events that occurred immediately prior and subsequent to the shooting." *State* v. *Grant*, 219 Conn. 596, 597, 594 A.2d 459 (1991).

with Osborne, Grant and Gordon participating." This argument lacks merit.

Wright was in his living room at his home at about 7:30 p.m. on March 18, 1988, watching his television.[21] Glancing out his window, he saw the victim's white car arrive and also "a light blue hatchback," which was apparently the Mazda operated by Grant. He said that the passenger in the light blue hatchback "got out" and "appeared to argue with the driver" of the white car. Wright then looked away. He heard a male on the corner yell, "No," and he again looked out. Wright then saw one of the males by the white car reach inside his jacket and pull out something. He heard two more shots and he saw the blue car flee the scene with three males who were at the scene. Wright told the police that he did not see which man shot a gun.

Likewise, Hampton's statement does not avail the petitioner. When Hampton came to visit his friends on Lyme Street, he saw three males leaning against the driver's side of a "small white vehicle" parked on Lyme Street. He said that "they did not appear to be arguing" and that they all seemed to know each other and "were just talking like old friends." He left Lyme Street before any shooting started, and, when he returned to his friends' house there, the police had already marked off the area as a crime scene. It seems clear that Wright's statement would be of dubious value and that of Hampton of marginal utility, if any, in supporting the petitioner's claim that both would have supported his claim that he was not the shooter, but rather that both Wright's and Hampton's statements are consistent with Osborne, Grant and Gordon participating."[22]

---

[21] As noted previously, the detective who interviewed Wright on the night of the shooting noted that Wright had been drinking, but was not intoxicated.

[22] Grant's conviction as an accessory to murder hardly avails the petitioner. If anything, it eliminates Grant as the actual shooter. Moreover, on the evidence adduced in the habeas court, it is sheer speculation for the petitioner to suggest, without appropriate evidentiary basis, that either Osborne or Gordon was the actual shooter.

In advancing his self-defense argument, the petitioner claims that he feared that the victim was reaching for a gun and that he felt that he was in danger of the victim imminently using physical force upon him. Here, he invoked not only his fear of the use of imminent physical force, but also that he was nervous and under stress at the time of this confrontation because of the victim's propensity to violence. The evidence demonstrates, however, that the petitioner was hardly too nervous or stressed not to have carefully planned and staged this incident. The fact is that no weapon was found in the victim's car or on his person. The petitioner's theory that he fired in self-defense reasonably believing that the victim was reaching for a weapon is questionable, keeping in mind that he was armed with a twelve gauge shotgun pointed at the victim.

This theory is also questionable, even when one considers the petitioner's claim that the victim had a propensity for violence. The victim's girlfriend, Sabrina Reynolds, did tell a detective that the victim "used to carry a gun often or have it in the trunk of his vehicle."[23] The victim's sister, Sophie Taylor, however, told the same detective that the victim "never carried or owned a firearm as far as she knew." On the basis of the foregoing, we determine that the petitioner could not have successfully claimed that he was not the initial aggressor.

b

The petitioner's self-defense claim would also fail because the facts clearly demonstrated that he had used excessive force. His evidence on this issue is seriously wanting. He argues that "the physical evidence was inconsistent with the claim that the shotgun had been

---

[23] Reynolds also told the detective that one or two weeks earlier the victim had discharged a gun at a funeral in accordance with a Jamaican tradition. The victim was Jamaican.

fired at point blank range." He claims also that had his counsel inquired of the medical examiner how far from the victim the muzzle of the shotgun was when fired that the medical examiner would have testified that it was fired between three and four feet from the victim. In fact, the medical examiner so testified. The term "point blank" was not defined during the proceeding. Webster's, however, defines the adjective "point blank" to mean "fired straight at a target without having to allow for appreciable drop in the line of flight of the missile shot . . . ." Webster's Third New International Dictionary. Here, each shot hit the target, the victim, in the face, neck and shoulder, and photographs show the blood and brain tissue of the victim on the windshield of the victim's Nissan. The petitioner's counsel would have also learned from the medical examiner and his autopsy report that there was "extensive" damage to the victim's facial structures and fractures of the frontal portion of the skull as well. Common sense cannot refute that the victim was shot at point blank range, not to mention by a twelve gauge shotgun. Even if we assume that the petitioner genuinely feared for his life, that still is not sufficient to validate his self-defense claim. That is because that "would not, however, have allowed [the jury] to find that *at the time he killed the victim,* it was reasonable for him to believe that the victim was about to use deadly physical force or inflict great bodily harm, and that it was necessary to kill the victim to prevent such conduct." (Emphasis in original.) *State* v. *Lewis,* supra, 220 Conn. 620. This is so viewing the evidence in the light most favorable to the petitioner.

We conclude, on the basis of the foregoing, that a reasonable investigation by the petitioner's counsel would have disclosed that on the evidence, the state reasonably could have defeated a claim of self-defense by demonstrating that the degree of force used by the

petitioner was excessive. See *State* v. *Fullard*, 5 Conn. App. 338, 342–43, 497 A.2d 1041 (1985).

3

Next, the petitioner claims that he has proven that, but for his counsel's ineffectiveness, there was a reasonable probability of a better outcome based on the theory that he acted without the intent to kill. We do not agree. In making this claim, he refers to the influence upon him of drugs, his fear of the victim, his interest at most to injure, rather than kill the victim, all of which point to a lesser included offense of murder, an acquittal or a more favorable recommendation by the prosecutor.

As to his mental state, the petitioner claims that "investigation of school records or even family history would have disclosed a substance abuse history." There was expert testimony that he was drug and alcohol dependent at the time of the shooting. There is, however, no evidence[24] that he was under the influence of drugs or alcohol at the time of the shooting. Neither Gordon nor Osborne, who both knew the petitioner for a number of years prior to the shooting mentioned in their statements that he was under the influence of either drugs or alcohol. We do not agree with the petitioner's claim that Gordon's statement to the police corroborated[25] "that the petitioner was under the influence at [the] time of the shooting." In any event, the state of being intoxicated does not, without more, establish the lack of intent to cause death. See *State* v. *Downey*, 45 Conn. App. 148, 156–57, 694 A.2d 1367, cert. denied, 242 Conn. 909, 697 A.2d 367 (1997); *State* v. *Rodriguez*, 44 Conn. App. 818, 821–22, 692 A.2d 846, cert. denied, 242 Conn. 902, 697 A.2d 363 (1997).

---

[24] The petitioner's presentence investigation report did make a statement suggesting an impairment at the time of the shooting; however, this self-serving statement was uncorroborated.

[25] In making this claim, the petitioner does not explain what evidence in Gordon's statement was "corroborated" in this regard.

Touching upon his mental state, the petitioner's brief notes that the evidence a reasonable investigation would have disclosed included "evidence that the victim survived for some period of time in the hospital [and that that] could be construed by a jury to support an inference that injury, not death, was intended." That this would contribute to a better outcome is a genuinely unusual claim. We do note, however, that the victim was pronounced dead within one hour after his hospital admission.

It is not all clear what a reasonable investigation would have unearthed to contribute to a reasonable probability on his intent claim given the petitioner's declared animosity toward the victim, his borrowing of the shotgun, his loading of that shotgun and the other aspects of his planning on the evening of the shooting. The evidence on intent that a reasonable investigation should have uncovered could have included the petitioner's checking the victim's body at the scene for money or drugs, his fleeing the scene, his instructing Osborne to wipe the fingerprints off the shotgun and his telling Gordon that the other three would be against whoever reported the homicide. Such conduct mitigates strongly against the reasonable probability of a better outcome.

"In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. *State* v. *Reid*, 193 Conn. 646, 655, 480 A.2d 463 (1984)." (Internal quotation marks omitted.) *State* v. *Joly*, 219 Conn. 234, 250, 593 A.2d 96 (1991). In *Joly*, our Supreme Court, quoting Wigmore, stated: "No one doubts that the state of mind which we call guilty consciousness is perhaps the strongest evidence . . . that the person is indeed the guilty doer . . . ." (Internal quotation marks omitted.) Id., 250–51, quoting 3A J. Wigmore,

Evidence (Chadbourne Rev. 1979) § 273 (1). Moreover, the petitioner's planning of the shooting and its execution must be factored into a consideration of the reasonable probability of a better outcome. Even had counsel more fully developed the matter of intent to kill, the evidence referred to would not demonstrate a reasonable probability of a better outcome either by way of an acquittal, being found guilty of a lesser included offense or a lesser sentence by negotiation with the state's attorney.

### 4

The petitioner claims also that the doctrine of "imperfect self-defense" raises a reasonable probability that, but for the ineffectiveness of his counsel, he would have achieved a better outcome. We do not agree. Contrary to his claim in this court, that doctrine is not a viable defense in this jurisdiction. In *State* v. *Abdalaziz*, 248 Conn. 430, 434, 729 A.2d 725 (1999), our Supreme Court stated: "We conclude that the doctrine of imperfect self-defense is not recognized in Connecticut, and, therefore, was not available to the defendant." It goes without saying, therefore, that doctrine was not a defense that the petitioner could properly advance at the relevant times in this case.

### 5

The petitioner also argues that he has demonstrated that there was a reasonable probability that he would have achieved a better outcome based on the theory of third party culpability. In making this claim, the petitioner maintains that the essentials of the state's claim, except the identity of the shooter, was answered by the physical evidence[26] and the statement of uninvolved

---

[26] We have already considered the matter of the physical evidence claim earlier and will not discuss it again. In any event, in advancing that argument, the petitioner's briefing does not refer to what physical evidence he means here.

witnesses.[27] He appears to contend that "additional strength" to all his defenses is given by the unnamed "two bystander witnesses" in their impeachment of the state's witnesses Osborne and Gordon. These "bystanders," he argues "described the events and identified the shooter *completely differently*" from the way Gordon and Osborne described him. (Emphasis added.) We agree with the petitioner that his "bystanders" evidence was "completely different" from that of Osborne and Gordon. Nevertheless, as noted, we determine that the evidence of Osborne and Gordon was much more reliable.

Because of the nature of his briefing of this claim, we assume that the "two bystander witnesses" were Wright and Hampton, both of whose statements we have discussed earlier. That discussion need not be repeated, although we incorporate it here. We also note, however, certain aspects. Hampton, of course, never actually witnessed the shooting, nor did he even know who the males were that he observed leaning against the white car. Wright testified inconsistently at the probable cause hearing on material matters, whereas Osborne and Gordon, who also testified at that hearing, did so substantially in accord with their police statements, which in turn were consistent with each other on material matters. Wright's statement to the police itself was inconsistent as to the identity of the shooter. This "bystander" evidence was at best, of minimal quality, even in combination with the "physical evidence." The evidence of alleged third party culpability was not such as to raise a reasonable probability of a better outcome as the petitioner claims.

---

[27] In speaking of "uninvolved witnesses" here, the petitioner does not identify these "uninvolved witnesses." This constitutes inadequate briefing. We will, however, assume that he means to refer to Wright and Hampton as we have earlier.

6

We now turn to the petitioner's claim that he did prove that, but for his counsel's ineffectiveness, he demonstrated a reasonable probability that he would have pleaded not guilty and gone to trial and achieved a better outcome. We do not agree that he would have gone to trial had he had the benefit of the credible evidence adduced in the habeas court. The habeas court found specifically that "the petitioner adduced *no* credible evidence [in the habeas court] that he would have elected to go to trial, even if fully informed, and risk incarceration for sixty years." (Emphasis added.) We have been given no real reason to set aside this finding. We concur with the habeas court's citation to *Copas*, a murder case, where the court, in accepting that petitioner's guilty plea, "gave the petitioner no assurance or indication of what it would do at sentencing." *Copas* v. *Commissioner of Correction*, supra, 234 Conn. 144.[28] In that case, the court, in awarding habeas relief, felt it was likely that the petitioner, but for the ineffectiveness of his counsel, would have elected a trial as, given the circumstances, he had no incentive to plead guilty. See id., 166. We believe that the present case presents a dissimilar scenario. First, from all the evidence adduced in the habeas court, the petitioner has not demonstrated the reasonable probability of a different outcome. Second, we agree with the court that the petitioner has "benefited substantially" from the plea bargain of an agreed recommendation of a forty year sentence, which is effectively twenty years less than the maximum in a strong case for the state.

III

Finally, the petitioner claims that the habeas court acted improperly and denied him his due process rights

---

[28] In *Copas*, the petitioner pleaded guilty, although the state had said that it intended to recommend the maximum sentence even if the petitioner were to plead guilty. *State* v. *Copas*, supra, 234 Conn. 166.

in holding that he did not have a right to appeal. Specifically, he alleges that neither the trial court nor the trial court clerk informed him of the right to appeal from his plea-based conviction.[29] Moreover, he also alleges that he "was not aware" of the right to appeal within the time to appeal.[30]

Initially, we note that in the fourth count, paragraph eighteen alleges that "[t]he trial court did not inform the petitioner of his right to appeal the judgment in [the underlying criminal case]," and that paragraph nineteen of that count alleges that "[t]he court clerk did not inform the petitioner of his right to appeal the judgment in [the underlying criminal case]." The respondent filed identical responses to these two paragraphs of the petition, which were, "respondent denies the allegations in paragraph 18 [and paragraph 19] *and also denies that there is any such right to appeal on the facts of this case.*" (Emphasis added.) "In recent years the application [for a writ of habeas corpus] has come to be regarded as a pleading in the nature of a complaint . . . and the return in the nature of an answer. The pleadings in this case are so framed. Once the issues have been joined the evidence proffered must be relevant to these issues." (Citation omitted.) *Arey* v. *Warden,* 187 Conn. 324, 332, 445 A.2d 916 (1982); *Evans* v. *Santoro,* 6 Conn. App. 707, 710 n.2, 507 A.2d 1007 (1986).

---

[29] We note that the petitioner incorporates by reference into the fourth count, which concerns the right to appeal, seventeen paragraphs from the first count (alleging ineffectiveness) one of which alleges that "[d]efense counsel did not inform the petitioner of his right to appeal the validity of his guilty plea." The habeas court made no specific finding on this allegation. In any event, there is neither evidence to the effect that the petitioner became dissatisfied with the conviction on his guilty plea within the time limited for taking an appeal, which was communicated to his counsel, nor is there any evidence of his attorney speaking to him, after his guilty plea, within the time period limited for taking an appeal.

[30] There is no evidence as to whether he was "aware" of the time limitation within which to take an appeal as he alleges because he did not testify in the habeas court.

The habeas court, in its memorandum of decision, addressed the fourth count of the petition after its discussion and conclusion that the trial court's canvass was adequate. In doing so, the habeas court stated that the petitioner's plea was entered knowingly and voluntarily despite the petitioner's claim, as the habeas court stated it, "that [the petitioner] was wrongfully denied the right to appeal his conviction because he was not informed by the court or clerk of his right to appeal . . . ." That claim, the habeas court stated, was "unavailing." It pointed out that the petitioner's guilty plea "was unconditionally made without any references to reservations of any issues" and then noted relevant Supreme Court decisions.[31] That "unconditional" plea, the habeas court stated, "constituted a waiver of any nonsubject matter jurisdictional defects in the pretrial proceedings." The habeas court then concluded that "[t]he petitioner had no right to appeal from the court's finding of guilt and its subsequent judgment." We agree with that result.

Neither *State* v. *Madera*, 198 Conn. 92, 97–97, 503 A.2d 136 (1985), nor *State* v. *Kelley*, 206 Conn. 323, 327, 537 A.2d 483 (1988), to which the habeas court referred involves the scenario of a guilty plea before trial where the trial court had found the guilty plea to be knowing and voluntary. Both *Madera* and *Kelley*, however, remain viable law in this jurisdiction. It is apparent that the habeas court, having concluded that the petitioner's guilty plea was knowing and voluntary, recognized that

---

[31] At this point, the habeas court's decision noted: "It is well established that, an unconditional plea of guilty or nolo contendere, intelligently and voluntarily made, operates as a waiver of all nonjurisdictional defects and bars the later assertion of constitutional challenges to pretrial proceedings. . . . Therefore, only those issues fully disclosed in the record which relate either to the exercise of jurisdiction by the court or to the voluntary and intelligent nature of the plea are ordinarily appealable. . . . *State* v. *Madera*, 198 Conn. 92, 97–98, 503 A.2d 136 (1985). *State* v. *Kelley*, 206 Conn. 323, 537 A.2d 483 (1988)." (Internal quotation marks omitted.)

he had no right to appeal under the circumstances of this case. Nor has the petitioner shown that he has this right. On this issue, we point out that the issue is framed by the petitioner's pleading in paragraphs eighteen and nineteen of the fourth count by the petitioner's own allegations of the duty of the trial court and the trial court clerk to inform him of the right to appeal, which was denied.[32] Even if the habeas court's method of reaching its ultimate decision on this issue might be said to be "faulty" or "questionable," it must stand as its judgment is responsive to the issues and is properly supported on other grounds. See *Walsh* v. *Turlick*, 164 Conn. 75, 86, 316 A.2d 759 (1972); *Baram* v. *Schwartz*, 151 Conn. 315, 317, 197 A.2d 334 (1964); *Malone* v. *Steinberg*, 138 Conn. 718, 723, 89 A.2d 213 (1952). Such analysis falls fairly within the penumbra of such cases as *Johnny Cake, Inc.* v. *Zoning Board of Appeals*, 180 Conn. 296, 301, 429 A.2d 883 (1980); *Favorite* v. *Miller*, 176 Conn. 310, 317, 407 A.2d 974 (1978); *Morris* v. *Costa*, 174 Conn. 592, 597, 392 A.2d 468 (1978).

The judgment is affirmed.

In this opinion the other judges concurred.

---

[32] We find it somewhat disingenuous for the petitioner to say as he does in his reply brief that "[he] has never claimed that the trial court or clerk is obliged to advise a [petitioner] of the right to appeal from a guilty plea."