******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

# BRYAN JORDAN *v.* COMMISSIONER OF CORRECTION
## (AC 42250)

Lavine, Prescott and Sheldon, Js.

*Syllabus*

The petitioner, who previously had been convicted of the crimes of manslaughter in the first degree with a firearm and carrying a pistol or revolver without a permit, sought a writ of habeas corpus, claiming that his trial counsel, D, provided ineffective assistance. He claimed, inter alia, that D was deficient in failing to adequately investigate and present available witnesses in support of his claim of self-defense and by failing to raise the defense of third-party culpability. D died prior to the petitioner's habeas trial and, thus, the habeas trial did not hear testimony regarding D's investigative efforts, trial strategy, or other tactical decisions. The habeas court rendered judgment granting the habeas petition, from which the respondent, the Commissioner of Correction, on the granting of certification, appealed to this court. *Held*:

1. The habeas court improperly concluded that D provided constitutionally deficient representation with regard to the petitioner's self-defense claim: the petitioner failed to meet his burden of demonstrating that D's investigation or decision not to call certain witnesses constituted deficient performance as he failed to present testimony regarding D's investigative efforts and, thus, failed to overcome the strong presumption that D engaged in an objectively reasonable investigation, and he failed to present any evidence regarding D's trial strategy and, thus, failed to overcome the presumption that any decision not to call certain witnesses was sound trial strategy; furthermore, the habeas court's conclusion that the witnesses who testified at the habeas trial were credible and could have lent additional support to the petitioner's claim of self-defense was premature in the absence of a determination that D's performance was deficient.

2. The habeas court improperly determined that D provided ineffective assistance because she failed to pursue a third-party culpability defense: the court failed to consider whether D's decision might be viewed as a reasonable strategic decision and the petitioner failed to present evidence that this decision constituted deficient performance; the record was clear that, although D did not request a third-party culpability instruction, she did argue to the jury that the victim was killed by a bullet fired by someone other than the petitioner, and there were a number of reasons why D may have chosen to present the third-party culpability defense in this manner.

Argued November 12, 2019—officially released June 9, 2020

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Kwak, J.*; judgment granting the petition, from which the respondent, on the granting of certification, appealed to this court. *Reversed*; *judgment directed.*

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Rebecca A. Barry*, supervisory assistant state's attorney, for the appellant (respondent).

*Daniel J. Krisch*, assigned counsel, for the appellee (petitioner).

*Opinion*

PRESCOTT, J. This appeal highlights the significant hurdle a habeas corpus petitioner faces in seeking to prove a claim of ineffective assistance of trial counsel after trial counsel has died and, thus, is unavailable to provide evidence of counsel's strategic decisions regarding, inter alia, the pursuit of defenses for her client and calling witnesses in support of those defenses. The death of the petitioner's trial counsel prior to a habeas corpus trial, however, does not absolve a petitioner of his heavy burden of overcoming the strong presumption that counsel provided effective assistance. See *Strickland* v. *Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); see also *Slevin* v. *United States*, 71 F. Supp. 2d 348, 358 n.9 (S.D.N.Y. 1999) ("[b]ecause the death of a petitioner's trial counsel is just as, if not more, likely to prejudice the respondent, it does not relieve the petitioner of his heavy burden of proving ineffective assistance" (internal quotation marks omitted)), aff'd, 234 F.3d 1263 (2d Cir. 2000).

The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting a petition for a writ of habeas corpus filed by the petitioner, Bryan Jordan. The respondent claims on appeal that the habeas court improperly determined that the petitioner's trial counsel rendered ineffective legal assistance by failing to investigate adequately and to present available witnesses in support of the petitioner's claim of self-defense and, alternatively, by failing to raise the defense of third-party culpability. We agree with the respondent that the habeas court failed to hold the petitioner to the requisite burden of proof and, accordingly, reverse the judgment of the habeas court.

In the underlying criminal matter, the petitioner was charged with murder in violation of General Statutes § 53a-54a (a) and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35. A jury found the petitioner not guilty of murder, but guilty of the lesser included offense of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a). The jury also found the petitioner guilty of carrying a pistol or revolver without a permit. The court sentenced the petitioner to a total effective sentence of forty-five years of imprisonment.[1]

This court briefly summarized the facts underlying the petitioner's criminal conviction in its opinion affirming the judgment of conviction. See *State* v. *Jordan*, 117 Conn. App. 160, 161 978 A.2d 150, cert. denied, 294 Conn. 904, 982 A.2d 648 (2009). "The charges in this case stem from the shooting death of Curtis Hannons [(victim)] on September 19, 2005. On the day of the shooting, the [petitioner], the victim and the victim's brother, [Jason Kelly, also known as Mookie] got into

an argument. After the argument was broken up, the [petitioner] got into his car and left. A few minutes later, the [petitioner] returned, and another heated discussion took place with the victim. Several people congregated near the two and tried to calm down the [petitioner] and the victim. Three eyewitnesses gave slightly varying accounts of what happened next. All agreed that they heard a gunshot and that the [petitioner] then pulled out a gun and shot the victim once in the head. The [petitioner] ran away, and the witnesses heard about six or seven more gunshots. The victim was transported to a hospital, where he died. The [petitioner] was arrested in Georgia some time later." (Internal quotation marks omitted.) Id., 161–62.

On direct appeal, this court rejected the petitioner's claims that prosecutorial improprieties that occurred during the state's closing argument had deprived him of a fair trial[2] and that the trial court improperly had precluded him from presenting evidence regarding illegal drugs that were found on the victim. Id., 161, 170. In so concluding, this court indicated that "the state's case [against the petitioner] was strong" and "[t]here was sufficient testimony for the jury to conclude that the [petitioner had not been] acting in self-defense . . . ." Id., 170.

The petitioner filed the underlying petition for a writ of habeas corpus on February 11, 2015, which was his third habeas petition challenging his manslaughter conviction.[3] Appointed habeas counsel filed the operative eight count revised amended petition on September 26, 2017. Count one alleged that the petitioner's criminal trial counsel, Diane Polan, had provided ineffective assistance of counsel by failing to conduct a proper investigation and by failing to present available evidence supporting the petitioner's assertion that he had shot the victim in self-defense. Count two alleged that Polan also had provided ineffective assistance by failing to impeach one of the state's witnesses, Detective Clarence Willoughby, who had conducted the police investigation of the shooting. Count three alleged a *Brady* violation[4] regarding the state's alleged failure to disclose potential impeachment evidence pertaining to Willoughby. Count four alleged ineffective assistance of counsel by Polan premised on her failure to raise a third-party culpability defense. Count five alleged that Polan provided ineffective assistance of counsel with respect to an issue of alleged juror misconduct. Count six alleged a second *Brady* violation, this one premised on the state's failure to correct allegedly false testimony by one of its witnesses. Count seven alleged that Polan provided ineffective assistance by failing to object to the prosecutorial impropriety that occurred during closing argument or to request a curative instruction with respect to that impropriety. Finally, count eight alleged that the state improperly failed to disclose evidence of pending criminal charges against one of the state's

witnesses. The respondent filed a return that left the petitioner to his proof on all counts of the petition.[5]

The habeas court, *Kwak, J.*, conducted a trial on January 22 and February 5, 2018. Significantly, the habeas court did not hear any testimony from Polan regarding her investigative efforts, trial strategy, and other tactical decisions because she had died prior to the habeas trial. Rather, the habeas court heard testimony from the petitioner and eight additional witnesses called on his behalf. Specifically, the petitioner elicited testimony from Polan's former private investigator, Mike O'Donnell, and Attorney Robert McKay, who testified as the petitioner's expert witness on professional standards. The court also heard testimony from the following six witnesses, all of whom allegedly had witnessed events at or around the time of the shooting, but whom Polan did not call to testify at the criminal trial: Alexis Jordan, the petitioner's niece; the petitioner's sisters, Jymisha Freeman and Audrey Jordan; Flonda Jones, a friend of both the petitioner and the victim; James Walker, a relative of the victim; and Billy Wright, an acquaintance of both the petitioner and the victim. The court also admitted into evidence as full exhibits copies of the transcripts of the entire criminal trial. A written statement given by Jones to O'Donnell prior to the criminal trial also was admitted as a full exhibit.

Following the habeas trial, both parties submitted posttrial briefs, and the petitioner filed a posttrial reply brief. In his posttrial brief, the petitioner withdrew counts three, five, six, and eight of his petition, electing to pursue only the remaining four counts, all of which alleged ineffective assistance by Polan as trial counsel.

The habeas court issued a memorandum of decision on October 1, 2018, in which it granted the petition for a writ of habeas corpus on the basis of two of the four counts of ineffective assistance. Specifically, the habeas court determined that, with respect to counts one and four, the petitioner had met his burden of demonstrating that Polan had rendered constitutionally deficient performance by failing to investigate properly or to present available evidence in support of the petitioner's claim of self-defense and by failing properly to investigate, raise, or present evidence in support of a third-party culpability defense. The habeas court further determined that the petitioner had demonstrated that these deficiencies in counsel's performance had prejudiced him by unduly diminishing his due process right to establish a defense. The habeas court rejected the petitioner's other claims of ineffective assistance.[6] The habeas court vacated the petitioner's manslaughter conviction and remanded the matter to the trial court for further proceedings. Following the granting of his petition for certification to appeal,[7] the respondent filed the present appeal. Additional facts will be set forth

as needed.

## I

We begin our discussion by setting forth guiding principles of law as well as our standard of review, which are well settled. "A criminal defendant's right to the effective assistance of counsel extends through the first appeal of right and is guaranteed by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution. . . .[8] To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [supra, 466 U.S. 687]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment." (Citations omitted; footnote added; internal quotation marks omitted.) *Small* v. *Commissioner of Correction*, 286 Conn. 707, 712–13, 946 A.2d 1203, cert. denied sub nom., *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). "To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." (Internal quotation marks omitted.) *Antwon W.* v. *Commissioner of Correction*, 172 Conn. App. 843, 849–50, 163 A.3d 1223, cert. denied, 326 Conn. 909, 164 A.3d 680 (2017).

On appeal, "[a]lthough the underlying historical facts found by the habeas court may not be disturbed unless they [are] clearly erroneous, whether those facts constituted a violation of the petitioner's rights [to the effective assistance of counsel] under the sixth amendment is a mixed determination of law and fact that requires the application of legal principles to the historical facts of [the] case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, 308 Conn. 463, 469–70, 68 A.3d 624, cert. denied sub nom. *Dzurenda* v. *Gonzalez*, 571 U.S. 1045, 134 S. Ct. 639, 187 L. Ed. 2d 445 (2013).

Because our resolution of the present case turns on our review of the performance prong, some additional explication of that prong is necessary.[9] "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable. . . . Nevertheless, [j]udicial

scrutiny of counsel's performance *must be highly deferential.* It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court *must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance*; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action *might* be considered sound trial strategy. . . .

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . . At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . .

"Inasmuch as [c]onstitutionally adequate assistance of counsel includes competent pretrial investigation . . . [e]ffective assistance of counsel imposes an obligation [on] the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case. . . .

"Nevertheless, strategic choices made after thorough investigation of law and facts relevant to plausible options *are virtually unchallengeable*; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

"The reasonableness of counsel's actions may be determined or substantially influenced by the [petitioner's] own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the [petitioner] and on information supplied by the [petitioner]. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally

known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. . . .

"Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation *and without adequate explanation*, failed to call the witness at trial. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it. . . . Furthermore, [t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. . . .

"Finally, our habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when: (1) counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case; (2) the defendant provides some information, but omits any reference to a specific individual who is later determined to have exculpatory evidence such that counsel could not reasonably have been expected to have discovered that witness without having received further information from his client; or (3) the petitioner fails to present, at the habeas hearing, evidence or the testimony of witnesses that he argues counsel reasonably should have discovered during the pretrial investigation." (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 679–82, 51 A.3d 948 (2012); see also *Meletrich* v. *Commissioner of Correction*, 332 Conn. 615, 628, 212 A.3d 678 (2019) ("decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel" (internal quotation marks omitted)).

"[T]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (Internal quotation marks omitted.) *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 637. The United States Supreme Court has cautioned that a reviewing court, in considering whether an attorney's performance fell below a constitutionally acceptable level of competence pursuant to the standards set

forth herein, must "properly apply the strong presumption of competence that *Strickland* mandates" and is "*required* not simply to give [trial counsel] the benefit of the doubt . . . but *to affirmatively entertain the range of possible reasons* [*that*] *counsel may have had for proceeding as* [*she*] *did*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Cullen* v. *Pinholster*, 563 U.S. 170, 196, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011). This strong presumption of professional competence extends to counsel's investigative efforts; see *Thompson* v. *Commissioner of Correction*, 131 Conn. App. 671, 698, 27 A.3d 86, cert. denied, 303 Conn. 902, 31 A.3d 1177 (2011); as well as to choices made by counsel regarding what defense strategy to pursue. See *Veal* v. *Warden*, 28 Conn. App. 425, 434, 611 A.2d 911, cert. denied, 224 Conn. 902, 615 A.2d 1046 (1992). With the foregoing legal principles in mind, we turn to our discussion of the merits of the respondent's claims on appeal.

## II

The respondent first claims that the habeas court improperly determined that Polan rendered ineffective assistance of counsel with respect to the petitioner's claim of self-defense. Specifically, the respondent argues that the habeas court's determination that Polan failed to investigate adequately the shooting and to interview potential witnesses whose testimony could have supported the petitioner's self-defense claim was wholly unsupported by the record presented. Furthermore, the respondent argues that the habeas court never expressly considered if Polan may have had a reasonable and strategically sound basis for not calling certain witnesses, including Jones, as self-defense witnesses during the criminal trial and, to the extent that a negative answer to that question is implicit in the court's ruling, neither the law nor the facts of this case supports it. We agree that the habeas court improperly concluded that Polan's handling of the petitioner's self-defense claim necessarily fell below the minimal constitutional standard required by the sixth amendment.

## A

We first set forth the well settled substantive principles underlying a defendant's claim of self-defense. In Connecticut, self-defense is codified in General Statutes § 53a-19. "As interpreted by our Supreme Court, § 53a-19 (a) provides that a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack." (Emphasis omitted; footnote omitted; internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, 154 Conn. App. 78, 88–89, 105 A.3d 294 (2014), cert. denied, 315 Conn. 920, 107 A.3d 959 (2015).

Our self-defense statute nonetheless also provides that "a person is not justified in using deadly physical force if he or she knows that he or she can avoid the necessity of using such force with complete safety . . . by retreating." General Statutes § 53a-19 (b) (1). "Thus, a defendant who raises a claim of self-defense is required to retreat in lieu of using deadly physical force if the state establishes beyond a reasonable doubt that a completely safe retreat was available and that the defendant actually was aware of it." *State* v. *Saunders*, 267 Conn. 363, 374, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004).

Furthermore, "[a] defendant who acts as an initial aggressor is not entitled to the protection of the defense of self-defense . . . [unless] he withdraws from the [initial] encounter and effectively communicates to such other person his intent to do so." (Citations omitted; internal quotation marks omitted.) *State* v. *Berrios*, 187 Conn. App. 661, 715, 203 A.3d 571, cert. denied, 331 Conn. 917, 204 A.3d 1159 (2019); see General Statutes § 53a-19 (c). Importantly, "a person may respond with physical force to a reasonably perceived threat of physical force without becoming the initial aggressor and forfeiting the defense of self-defense. Otherwise, in order to avoid being labeled the aggressor, a person would have to stand by meekly and wait until an assailant struck the first blow before responding. If an assailant were intending to employ deadly force or inflict great bodily harm, such an interpretation of the statute would be extremely dangerous to one's health. Such a bizarre result could not have been intended by the legislature." *State* v. *Jimenez*, 228 Conn. 335, 341, 636 A.2d 782 (1994).[10]

"[A] defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt. . . . Accordingly, [u]pon a valid claim of self-defense, a defendant is entitled to proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . . As these principles indicate, therefore, only the state has a burden of persuasion regarding a self-defense claim: it must disprove the claim beyond a reasonable doubt." (Internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, supra, 154 Conn. App. 90–91.

## B

We next discuss the state's and the defense's theories of the underlying criminal case, which are necessary to place our subsequent analysis in its proper context.

At the criminal trial, the state advanced the following theory of the case to the jury during its closing argument. The petitioner and the victim, who were acquaintances, had become engaged in an argument in an area outside the housing projects on South Genesee Street. The victim's brother, Mookie, initially was involved in the argument. A number of area residents were present and observed all or part of the events at issue and attempted to defuse the situation. Although the initial argument between the petitioner, the victim, and Mookie ended with the petitioner leaving the area in his car, he returned shortly afterward and the confrontation between him and the victim resumed. According to multiple eyewitnesses, the confrontation ended after a bystander to the argument fired a shot, at which point the petitioner drew a gun and fired it at the victim, who was standing only a few feet in front of him. The victim, who had attempted to duck or turn away from the petitioner just prior to the petitioner shooting, was struck by a bullet that entered his skull just above his right ear and exited the upper left side of his skull. The victim fell to the ground only after the petitioner fired his gun at the victim, and a forensic examination of the stippling around the wound demonstrated that the bullet that hit the victim had been fired from close range. The petitioner not only fled the immediate scene but also could not be located by law enforcement personnel investigating the shooting because he left the state, which the state claimed evidenced his consciousness of guilt and supported its claim that he did not act in self-defense.

The defense attacked the state's case first by challenging the credibility of the state's witnesses and pointing out the numerous factual inconsistencies in their testimony about the shooting, which the defense argued created reasonable doubt as to the trustworthiness of the evidence presented as a whole. The defense also argued that it was the victim, and not the petitioner, who had restarted the argument after initially walking away from the confrontation. Although not disputing that he had been armed or even that he had fired his gun, the petitioner asserted that he had fired only out of fear for his life in response to the first shot fired, which had hit the ground near his feet. The petitioner argued that events happened so fast that he never formed any specific intent to kill or cause serious physical injury to anyone, including the victim. Further, he argued on the basis of the autopsy evidence regarding the trajectory of the bullet that struck the victim, coupled with the fact that no bullets or casings were ever recovered, that reasonable doubt clearly existed about whether his bullet had struck the victim rather than a bullet fired by someone else, perhaps even a ricochet from the first shot fired. Finally, he argued that he was not the initial aggressor and that he reasonably believed, on the basis of his observations, that the victim and

others present were armed and that his own life was in danger at the time he fired his weapon and, accordingly, his actions were justified as self-defense.

The state rebutted the petitioner's claim of self-defense, arguing to the jury that the evidence presented at trial established beyond a reasonable doubt that the petitioner's belief that he needed to use deadly physical force under the circumstances was objectively unreasonable. The state also asserted that it had established that the petitioner was the initial aggressor and that he had failed effectively to retreat from the conflict but, instead, having briefly left, had returned to continue the confrontation.

C

Our de novo consideration of whether Polan's efforts to prepare and present the petitioner's self-defense claim were objectively reasonable under the circumstances necessitates that we begin with a more comprehensive discussion of the evidence of self-defense that was before the jury at the criminal trial. Only after considering the evidence actually presented to the jury can we properly assess the significance of the evidence presented by the petitioner at the habeas trial and, in particular, the testimony provided by those habeas witnesses whom the petitioner offered in support of his allegations that Polan had not conducted a proper investigation and improperly had failed to call as a trial witness at least one eyewitness to the shooting whom Polan knew of and had subpoenaed for trial.

Roger B. Williams, Sr., was a key witness for the state at the petitioner's criminal trial. Williams lived in the area of the shooting and knew both the victim and the petitioner. He testified that he was present throughout the relevant events and saw the petitioner shoot the victim. During the confrontation that took place shortly before the first shot was fired, Williams stated that the petitioner was standing only a few feet in front of the victim. According to Williams, Wright, Mookie, and others were all nearby during that initial confrontation between the petitioner and the victim. Mookie, however, was no longer present when the argument continued and the victim was shot. According to Williams, both the victim and Wright pulled out their guns before the petitioner. Next, a shot was fired, ostensibly by Wright,[11] and the petitioner then pulled out a gun, pointed it at the victim, and fired. Williams testified that the victim, having seen the petitioner drawing his gun, "kinda threw his hands up and turned, turned away from him." The victim did not fall to the ground until after the petitioner fired his weapon. Williams' testimony, if credited by the jury, could have demonstrated that the victim and others nearby were armed at the time the victim was shot and that the victim had drawn a weapon before the petitioner fired a shot. This evidence, if credited, supported the petitioner's claim that

he feared that deadly force was about to be used against him and that he had fired only in self-defense. Williams' testimony also tended to show that the petitioner had not fired first, and thus that he may have done so in response to the initial shot fired.

Kimberly Stevenson also was called by the state as a witness at the petitioner's criminal trial. The victim and Stevenson had children together. She testified that she was looking out her bedroom window at the time of the shooting. She stated that she had spent the afternoon leading up to the shooting with the victim and that she never saw him with a gun during that time. She said that she only heard the first gunshot and did not see who fired it. She claimed that, after hearing that first shot, however, she saw the petitioner pull a revolver from his pants and fire at the victim's head. On cross-examination, Stevenson, like Williams, testified that Mookie was not present at the time the shooting occurred. She also denied that she had told O'Donnell prior to trial that she had seen Wright with a gun in his hand at the time the first shot was fired. Similar to Williams, Stevenson indicated that the victim was turning away from the petitioner when he was shot. Although Stevenson's testimony was damaging to the petitioner in some ways, she testified consistently with other witnesses that a shot was fired before the petitioner shot the victim, thereby lending some support to the defense claim that the petitioner feared for his life and fired in response to a perceived threat.

Andre Martin, who was a friend of the petitioner and an eyewitness to the shooting, was called to testify at the criminal trial by the state but indicated on the stand that he had no memory of what had transpired at the time of the shooting. Pursuant to § 6-10 of the Connecticut Code of Evidence and *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the criminal trial court admitted into evidence for substantive purposes a transcript of a recorded oral statement given by Martin to the police.[12] In that statement, Martin indicated that he saw the petitioner draw a gun, point it at the victim, and then fire one shot. Martin's testimony was particularly damaging to the defense, but Polan, through her cross-examination of Martin, attempted to discredit the veracity of Martin's statement to the police by drawing the jury's attention to the fact that the statement was given while Martin was in custody on charges unrelated to the present case and facing a charge of violation of probation.

Two officers who responded to the scene shortly after the shooting, Matthew Myers and Willie Ponteau, each testified at trial on behalf of the state. Ponteau, who lived near the crime scene and was home at the time of the shooting, heard two gunshots fired in close succession to one another, which were then followed

by multiple shots. Although Ponteau had no way of knowing who fired the shots that he heard, his testimony regarding the number of shots and their timing relative to one another was not inconsistent with the testimony of other witnesses who indicated that the petitioner had fired immediately after the initial shot. Both officers testified that they did not observe any type of weapon on or near the victim. Ponteau, however, remembered seeing Stevenson near the body when he arrived and, on cross-examination by Polan, Ponteau admitted that he had no knowledge of whether someone may have removed a gun from the victim before the police arrived. This testimony did not undermine other evidence that the victim had been armed, which lent support to the defense argument that the petitioner reasonably feared that he was in danger of having deadly force used against him when he shot the victim.

The petitioner testified on his own behalf in support of his claim of self-defense. According to the petitioner, before the first gunshot was fired, he was standing about five feet away from, and directly in front of, the victim. The petitioner did not know whether the victim actually had a gun but had observed him fumbling with his pocket in a way that suggested he might be armed. The petitioner also indicated that he believed Mookie had a gun based on "the way he was acting." The petitioner testified that he pulled out his handgun only in response to the first gunshot and fired it in the direction of the victim because he believed that that was the direction from which the first shot had been fired. According to the petitioner, the victim was still standing after the petitioner fired and started running away from the scene.

The state, through its cross-examination of the petitioner, was able to undermine the petitioner's direct testimony. Specifically with respect to his self-defense claim, the state was able to undermine the petitioner's assertion that he was in fear when he fired at the victim, getting him to admit that he was familiar with guns, he often carried one, he had heard gunshots fired near him in the past and, in fact, he "had been shot at before." The petitioner also testified on cross-examination that, on the day of the shooting, he was not always sure when he was in actual possession of his gun, indicating that sometimes he left it in the glove compartment of his vehicle. Although the petitioner never disputed having a weapon or firing it toward the victim, the jury reasonably could have inferred from his testimony that he may not have had his gun when the argument with the victim first begun and that he left the argument initially only to return to his car and retrieve his gun, facts relevant both to the duty to retreat and to whether the petitioner was the initial aggressor. Finally, the jury was provided with testimony from Susan Williams, the medical examiner who performed the autopsy of the victim. She provided testimony that the victim had a

one-quarter inch entrance wound on the right side of his head, approximately two inches above and behind his right ear, and an approximately three inch exit wound on the left side of his forehead. She described the path of the bullet that made the wounds as travelling "leftward, forward, and slightly upward." She further explained that stippling around the entrance wound, which is caused when gunpowder expelled along with the bullet abrades the skin, indicated that the gun from which the bullet had come was fired within approximately two feet of the victim. The evidence concerning the trajectory and location of the bullet wound provided a basis for Polan to suggest to the jury that reasonable doubt existed concerning the source of the bullet that killed the victim. Specifically, it tended to support an argument that the bullet could not have come from the petitioner's weapon because he was standing directly in front of the victim when he fired, rather than to the victim's right. It was also consistent with the defense theory that it was the result of a ricochet from the first shot fired because the bullet entered the right side of the victim's skull travelling upward. Of course, both arguments failed to account for the testimony that the victim had been turning away from the petitioner when the petitioner fired or for the presence of the stippling, which tended to show that the wound had been caused by a bullet fired directly from a weapon at close range.

Polan, attempting to capitalize on the inconsistent factual testimony of the state's own witnesses, began her closing argument by attempting to persuade the jury that there was reasonable doubt about what had occurred, including as to whether the state had proven that the petitioner intended to kill the victim when he fired his weapon or whether it was the petitioner's bullet that killed the victim. Polan later also advanced the argument that, even if the petitioner's bullet had hit the victim, the petitioner had fired his weapon in self-defense. Polan emphasized to the jury that as long as the petitioner had presented some evidence that would support his claim of self-defense, the burden shifted to the state to disprove self-defense beyond a reasonable doubt, which Polan argued the state had failed to do. She highlighted the petitioner's testimony that he believed he was in imminent danger of being shot, and, in fact, that he initially thought that he had been shot. She also noted that the state could not demonstrate that the petitioner's belief was objectively unreasonable because all of the state's witnesses had testified that someone else had fired a shot before the petitioner discharged his weapon.

Polan also highlighted Williams' testimony that the first shot hit the dirt near the petitioner's feet. Polan argued to the jury that the state could not prove that the petitioner had used unreasonable force under the circumstances when he fired his gun, stating that it was undisputed that the petitioner was being shot at, the

petitioner "had his back against the wall, there was no way he could get out, and he used deadly force because deadly force was being used against him." She argued that although the state could defeat the petitioner's self-defense claim if it could prove that the petitioner had been the initial aggressor, the evidence did not support such a finding beyond a reasonable doubt. She stated: "There is no evidence in this case that [the petitioner] drew his weapon or made any movement [as] if he was going to draw a weapon before either [the victim] was reaching for his pocket as [Williams] says or a shot was fired at [the petitioner's] feet, that's the reality."

Polan ended her closing argument by summarizing her theory of the defense, stating: "This is a tragic killing, it's a tragedy that [the victim] is . . . not with us today but it's not a murder. It's not a murder because the state cannot prove the specific intent to kill beyond a reasonable doubt and again there is ample evidence here that [the petitioner] acted in self-defense. He was shot at [and] didn't know where the shots were coming from. It all happened so quickly that he did not form a specific intent to kill [the victim]. Yes, he shot in his direction he told you that when he testified here yesterday but his intent was not to kill [the victim]. [His] intent was to protect himself." After the state's rebuttal argument, the court instructed the jury on the law, which included a detailed and lengthy instruction on self-defense. See footnote 10 of this opinion. Ultimately, the jury acquitted the petitioner of the murder charge, but found him guilty of the lesser included offense of manslaughter in the first degree with a firearm, rejecting the petitioner's self-defense argument.

By way of summary, and as this court indicated in deciding the petitioner's direct criminal appeal, the trial witnesses gave partially conflicting or inconsistent accounts of the shooting. Their testimony differed as to who was present when the victim was shot, where people were standing with respect to one another, and who was carrying a weapon. Although the state's case against the petitioner was strong, consisting of more than one eyewitness who observed the petitioner shoot the victim in the head at close range, sufficient evidence nonetheless was introduced to the jury through those same witnesses that, if credited by the jury, could have supported the petitioner's claim that he nonetheless had acted in self-defense. The jury ultimately concluded in convicting the petitioner of manslaughter in the first degree with a firearm that the state had disproven self-defense beyond a reasonable doubt. Nevertheless, our review of the criminal trial transcripts does not reflect any evidence from which reasonably to conclude that Polan either lacked adequate preparation for trial or was not knowledgeable about the facts of the case. In fact, Polan made effective use of the available evidence in her closing argument to the jury.

D

Turning to the habeas proceedings, the habeas court nevertheless concluded that Polan had provided ineffective assistance with respect to the petitioner's claim of self-defense. The habeas court based that conclusion principally on two reasons. First, the habeas court concluded that Polan had not conducted an adequate pretrial investigation, which, according to the court, resulted in her having failed to discover several additional witnesses that the habeas court concluded would have helped her raise reasonable doubt regarding self-defense. In reaching that conclusion, the habeas court appears to have relied exclusively on the testimony of the witnesses offered by the petitioner at the habeas trial, whom the habeas court found to be credible. The court specifically attributed Polan's failure to call the witnesses whom the petitioner presented at the habeas trial to "Polan's deficient investigation." Second, the habeas court concluded that Polan acted deficiently by not calling Jones to testify at the criminal trial, although Polan allegedly knew of Jones and had subpoenaed her as a witness for trial.

The respondent, however, contends that the habeas court's findings regarding the investigation were clearly erroneous because they were unsupported by any evidence in the record and, in fact, suggests that the record directly contradicts the court's findings. The respondent also maintains that, although the court found the habeas witnesses credible, it failed to consider (1) whether Polan may have had an objectively reasonable strategic reason for not seeking out additional witnesses beyond those already identified by the state or through the efforts of her investigator or (2) whether knowledge of the habeas witnesses' testimony would have caused a reasonably competent defense counsel to have altered the defense strategy pursued at trial. We find the respondent's arguments persuasive, partly because the habeas court's conclusions are not supported by relevant and necessary factual findings regarding Polan's investigative efforts and partly because of the lack of any apparent consideration by the court of whether a sound strategic reason might have existed for Polan's decisions regarding various witnesses. Furthermore, the court's conclusions are legally and logically flawed because they impermissibly shift the evidentiary burden of persuasion away from the petitioner and to the respondent.

The flaws in the habeas court's conclusions are apparent from our review of the habeas trial transcripts. More specifically, they are apparent from the testimony of the witnesses on which the court relied in concluding (1) that Polan had failed to conduct a sufficient investigation of the shooting, and (2) that a proper investigation would have uncovered witnesses whose testimony would have bolstered in some significant way the peti-

tioner's claim of self-defense. In considering that testimony, we focus our attention on what evidence the petitioner produced that directly pertained to Polan's investigative efforts, her knowledge or lack of knowledge of each particular witness, and, with respect to witnesses who were known or likely known to Polan, whether she may have had a reasonable strategic reason for not calling them to testify at the criminal trial. "Although it is incumbent on a trial counsel to conduct a prompt investigation of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction . . . counsel need not track down each and every lead or personally investigate every evidentiary possibility. . . . In a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities." (Internal quotation marks omitted.) *Johnson* v. *Commission of Correction*, 285 Conn. 556, 583–84, 941 A.2d 248 (2008).

1

The petitioner first called O'Donnell, Polan's investigator, to testify at the habeas trial. O'Donnell had very limited memory of his work in this matter. O'Donnell's testimony generally was unhelpful in establishing the petitioner's habeas claims because O'Donnell was unable to provide any insight into the extent of Polan's efforts to investigate or to locate witnesses in this case, or to describe the fruits of any discussions that Polan had with the petitioner. Rather, O'Donnell's testimony tended to show that, at a minimum, Polan had taken the reasonable step of hiring an investigator to look into aspects of the case. Ultimately, although O'Donnell had sat with Polan at counsel table throughout the trial, his testimony was devoid of any insight into Polan's decision–making process in this case or her defense strategy. O'Donnell specifically indicated that he "never discussed the witness list with [Polan]." Certainly, nothing in his testimony aided the petitioner in proving his habeas claims.

2

Next, the petitioner presented testimony from three witnesses—Audrey Jordan, Alexis Jordan, and Jymisha Freeman—all of whom were closely related to each other and to the victim, and none of whom actually witnessed the shooting at issue. Because these three witnesses provided roughly the same factual testimony relative to the issue of self-defense, we address them together. It is important to stress at the outset that the habeas court made no subsidiary findings regarding whether Polan or O'Donnell knew of these witnesses, had spoken to them about the incident, the content of any conversation the defense may have had with the witnesses, or whether the witnesses' versions of events at that time differed from the version of facts to which

they testified at the habeas trial. It was important for the petitioner to present these facts, particularly in light of Polan's unavailability, in order to overcome the presumption of constitutionally adequate performance.

Audrey is Alexis' mother and the sister of the petitioner and Jymisha. She testified at the habeas trial that she did not see the shooting, but only heard the gunfire from where she had been lying down inside her mother's house. She stated that when she arrived at the scene of the shooting, she saw Stevenson kneeling over the victim's body and placed her hand on Stevenson's back. Audrey indicated that an unidentified person whispered something into Stevenson's ear, after which Stevenson went inside her house and brought back a white cloth. Stevenson used that cloth to pick up and wrap a gun that was lying within inches of the victim's body. Stevenson took the gun inside the house, then returned to her position beside the victim's body. Audrey indicated that she saw Williams at the scene but did not see Jones, who, as we will discuss later, also testified at the habeas trial as an eyewitness to the shooting. Audrey observed several bullet holes in the petitioner's car, which was still at the scene.

Alexis testified at the habeas trial that the petitioner was her uncle. She was eight years old at the time of the shooting, and testified that she did not witness the victim being shot. She only heard the gunshots, approximately ten in total, from where she was inside her grandmother's home. She stated that when she ran outside, she saw the victim lying on the ground and a gun lying a few inches from his body. She testified that she then saw Stevenson go inside the house and retrieve a cloth of some sort, which Stevenson used to wrap up the gun and remove it from the scene.

Jymisha Freeman is the petitioner's sister and Alexis' aunt. She was only ten or eleven years old at the time of the shooting, and testified at the habeas trial that she was with Alexis inside her mother's house when she heard more than ten gunshots. She followed Alexis outside after the gunfire stopped. She was standing farther back from the body than Alexis and never saw a gun herself. She testified, when asked on cross-examination, that she saw Stevenson exit her house with a towel or cloth, although she did not observe her do anything with it.

With respect to Polan's investigative efforts and her knowledge of these witnesses in particular, it cannot reasonably be inferred from the testimony of these three witnesses that Polan failed to conduct a proper investigation or that she was unaware of what they could have told a jury if they had been called to testify at the criminal trial. Audrey testified that although she did not go to the police with her story, she eventually was interviewed by Detective Willoughby, who took notes of what she told him. She testified inconsistently about

whether she also had provided a written statement. Importantly, she indicated that she spoke with both Polan and O'Donnell about what had happened on the day of the shooting, and that she was subpoenaed for trial but later was told that her testimony would not be needed. The petitioner never asked Audrey to testify about what she had told Polan or O'Donnell regarding the shooting. Alexis testified that she never had spoken with the police or any investigator about the incident, and could not recall if she ever had spoken to Polan. Similarly, Jymisha testified that she never spoke to the police and never spoke to Polan about the shooting. Audrey may have told Polan and O'Donnell not only about the details of the shooting but about Alexis' and Jymisha's presence that day and what they may have observed.

The petitioner, in his habeas trial testimony, also indicated that he had told Polan that he had seen Jymisha outside, so Polan also may have had this information when she spoke with Audrey. We do not know from this record whether these three witnesses' names also appeared in police reports, none of which were made part of the habeas record, or if they were mentioned to Polan or O'Donnell by prosecutors or other eyewitnesses. In light of the strong, albeit rebuttable, presumption that trial counsel's investigative efforts fall within the necessarily wide range of constitutionally adequate performance, it is unreasonable to infer that Polan was unaware of these witnesses given the lack of evidence on this question.

Moreover, with respect to the petitioner's self-defense claim, these witnesses' testimony did not fill or implicate any critical or missing evidentiary element of self-defense. Their testimony, both independently and by way of corroboration of each other's testimony, only tended to demonstrate that a gun had been lying on the ground very near to the victim's body after he was shot, suggesting that it was the victim's gun and that he may have had it when he was shot. Williams, however, who testified on behalf of the state at the criminal trial and on whose testimony the state relied in support of its case, testified before the jury that the victim had drawn a gun prior to being shot by the petitioner. The habeas testimony regarding the presence of a gun after the fact was cumulative of, and not as compelling as, Williams' testimony, and certainly could not be considered essential to the defense.

Furthermore, whether the state successfully could disprove self-defense in this case did not depend on a determination of whether the victim *actually* had been armed, but only on the state disproving beyond a reasonable doubt that the petitioner had both a subjective and an objectively reasonable *belief* that the victim, or someone supporting the victim, was armed and about to use deadly force against the petitioner. Given Alexis'

and Jymisha's young ages at the time of the shooting and the fact that the petitioner was a close family member to them and to Audrey, if Polan knew of their potential testimony, a fact that cannot be determined on this record, Polan reasonably may have made the strategic decision not to call them. After all, the state's own witnesses tended to establish at the criminal trial that persons other than the petitioner were armed, had drawn weapons, and had fired once prior to the petitioner firing his own gun. Although Polan's strategy with respect to self-defense ultimately proved unsuccessful, that certainly did not render her strategic choices per se unreasonable.

3

We turn next to the habeas trial testimony provided by Jones. She testified at the habeas trial that she was a friend not only of the petitioner and his family, but also was friendly with the victim. She claimed that she was one of many persons present during the argument that preceded the victim being shot. According to Jones, during the argument with the victim, the petitioner stood only two or three feet in front of the victim. She testified that the victim's brother, Mookie, was standing close behind the victim at the time and that he too was involved in the argument. Jones testified that she never saw the petitioner leave and come back. Jones indicated that, as the argument got more and more heated, the victim reached multiple times for a gun that was tucked into his waistband, although she stated that he never drew it. Although Jones at first asserted that she saw Mookie fire the first shot, in subsequent testimony she indicated that she inferred it was Mookie who fired the first shot because she had observed dust or smoke coming from the gun he was holding immediately after the first shot was fired. According to Jones, it was not the first shot that killed the victim but a second shot that she claimed was fired by someone she did not see. Jones claimed that when the victim fell to the ground, his gun fell out of his waistband. Although she testified that she ran into the building where her sister lived shortly after the shots were fired, she also testified that she had observed Stevenson remove the gun from the scene and wrap it in a white towel.

It is undisputed that Polan was aware of Jones and had taken her statement about the events and, therefore, any decision not to call Jones at trial cannot be attributed to a failure by Polan to investigate the shooting. Jones testified that she spoke with the police about the incident and gave them a statement. She also testified that she had met with O'Donnell several times prior to the criminal trial and had provided him with a statement. She claims that she was subpoenaed for trial by the defense but that ultimately she was told that her testimony would not be needed. The record is silent regarding the reason for Polan's decision. Notably, how-

ever, the pretrial statement that Jones provided to O'Donnell, which was admitted as an exhibit during the habeas trial, differed in some ways from the testimony that Jones provided at the habeas trial.

In her written statement, Jones claimed that she had observed the initial confrontation between the petitioner, the victim, and Mookie. After that initial argument ended, but before the petitioner left in his car, she heard the petitioner ask the victim, "you going to confront me with a gun?" Jones then observed the petitioner leave in his car but return about five minutes later and resume his argument with the victim and Mookie. She stated that Mookie pulled a gun from his waistband and fired a shot, at which time both the victim and the petitioner pulled out guns. Finally, she stated in her written statement that the victim did not fall to the ground until after the petitioner fired his gun.

Whether to call a particular witness at trial, however, is a tactical decision for defense counsel, and, to the extent that the decision "might be considered sound trial strategy," it cannot be the basis of a finding of deficient performance. See *Strickland* v. *Washington*, supra, 466 U.S. 689. Polan's strategic decision not to call Jones as a witness at the criminal trial can properly be evaluated only on the basis of what Polan knew about Jones' potential testimony at the time of trial, not on the basis of the testimony that Jones later gave at the habeas trial, regardless of whether the habeas court deemed her later testimony credible. Jones' written statement, like her testimony at the habeas trial, indicated that she had information that was relevant to the petitioner's claim of self-defense.[13] There are a number of plausible reasons, however, why Polan may have decided that calling Jones to testify was either unnecessary or inadvisable because, even if she was believed by the jury, calling her might have opened up avenues of inquiry that would have hurt the defense's case.

First, Jones had a criminal record and was a friend of the petitioner and, therefore, her testimony would have been subject to significant impeachment by the state. Jones' account of the shooting contradicted that of other witnesses and the petitioner's own criminal trial testimony. For example, Jones claimed that Mookie was standing close to the victim both during the initial argument and at the time of the shooting, whereas Williams had testified at the criminal trial that Mookie was not present and the petitioner had testified that Mookie was "[s]tanding like off in the shadows." Further, and perhaps most importantly, the statement given by Jones to O'Donnell clearly indicated that she had heard the petitioner comment that he was aware that the victim was armed shortly before he drove off, returning a short time later. If Jones had stuck to that story at the criminal trial, as Polan might reasonably have expected, it could

have undermined the petitioner's claim of self-defense by suggesting that he had left the scene in order to arm himself. In sum, after hearing the state's witnesses, Polan may have decided that Jones' testimony was not critical to her client's self-defense claim and that the better strategic choice was to not call her as a witness. That is precisely the type of trial strategy that *Strickland* prohibits us from second-guessing postconviction.

### 4

Walker, who was a close friend of the victim, also testified at the habeas trial. He testified that he had witnessed the confrontation between the petitioner and the victim, claiming that he had stood about four feet from the victim during the argument leading up to the shooting. He testified that he saw the victim "flashing" a gun, but claimed that the gun stayed in the victim's waistband and that he never saw the victim "pull it out." Walker testified that he did not see who fired the first few shots because he was turned away but, when he looked back, he saw the victim on the ground. He also testified that he observed Mookie firing his weapon from where he had been standing on a stairway about ten or fifteen feet behind the victim. Walker further testified that he saw someone remove a weapon in a towel. When pressed, however, he said it was Williams who had done so, not Stevenson, as others had testified. Walker remembered seeing both Jones and Williams at the scene of the shooting.

Walker spoke with the police after the shooting but testified that he had never spoken to Polan or O'Donnell. He was not asked about the substance of his discussion with the police, however, and the habeas record contains no additional details about what he saw or said. Even so, according to the petitioner's testimony, he had discussed Walker with Polan. Further, as noted with other witnesses, the fact that Walker testified that he never spoke with any member of the defense team directly does not mean that Polan had not learned about Walker or his account of the shooting by reviewing police reports, interviewing the police, or discussing the case with prosecutors. Walker's testimony that the victim never actually drew his weapon was less compelling for purposes of the petitioner's self-defense claim than the testimony of Williams, who claimed that the victim actually drew his weapon. Given that his testimony also conflicted factually in other respects with that of other witnesses, even if Polan was aware of his account, she reasonably might have chosen not to present his testimony, believing that she would have a better chance of persuading the jury by relying on the state's witnesses.

### 5

The final eyewitness to the relevant events presented by the petitioner at the habeas trial was Wright, the

person who Williams testified at the criminal trial was present at the time of the shooting and was likely the person who had fired the first shot. Wright did not testify at the criminal trial. Wright testified at the habeas trial that he was friendly with both the victim and the victim's brother, Mookie. Wright stated that he was in the vicinity of the shooting when it occurred. Wright claimed that he saw the victim pull a gun from his waistband, at which point he decided to leave the scene. As he was leaving, however, he heard shots being fired. He denied that he personally had a gun at the time or that he was responsible for any gunshots that were fired either before or after the victim was shot.

As with Walker, there was no evidence presented to the habeas court that would have permitted the court to find, in contravention of the strong presumption of reasonable competence, that Polan or her investigator was either unaware of Wright's account or that Polan had failed to investigate him as a potential witness. See *Thompson* v. *Commissioner of Correction*, supra, 131 Conn. App. 698 (presumption of competent representation includes presumption of adequate investigation). Wright testified that he spoke with the police and also with an investigator from the prosecutor's office. His name was also provided to Polan by the petitioner. Assuming that the version of events provided by Wright at the habeas trial was known to Polan, as were the accounts of the other habeas witnesses, his testimony did not add in any significant way to the theory of self-defense actually pursued by Polan at trial nor did his testimony advance any alternative theory of defense that she could have pursued. Furthermore, it is reasonable to assume that Polan did not think that Wright would provide credible testimony because he had been identified by Williams as someone who was armed and may have fired the first shot.

6

The petitioner also testified on his own behalf at the habeas trial, as he had at the criminal trial. With respect to Polan's investigative efforts, the petitioner stated only that he had given Polan the names of several witnesses, including Freeman, Jones and Walker. Polan had told the petitioner that Jones had given the defense a written statement and that she believed this was a self-defense case. The petitioner testified that he believed that his self-defense strategy would have included calling a number of additional witnesses. The petitioner, however, provided no testimony that adequately filled in the evidentiary gaps created by Polan's unavailability at the habeas trial, including details about her efforts in reviewing the case file, the discovery provided by the state, her conversations with witnesses, and what she may have learned through the efforts of O'Donnell and others. The petitioner likewise provided no insight regarding Polan's strategy at trial.

Finally, the petitioner presented expert testimony from McKay. Although McKay had no direct knowledge of Polan's investigation, he nonetheless opined, on the basis of the habeas witnesses' testimony that was not presented at the criminal trial, that Polan "should have put more effort" into presenting the petitioner's self-defense claim to the jury. He testified that if Polan had presented the testimony of witnesses to establish that the victim had a gun, this would have strengthened the self-defense claim of the petitioner. Nevertheless, because the petitioner himself never claimed that he saw a gun, meaning the actual presence of a gun was not relevant to his subjective/objective perception of danger, whether other people had seen a gun or a gun actually was present would not have aided his claim of self-defense. Although he questioned the soundness of having O'Donnell sit at counsel table throughout the trial, which resulted in Polan's inability to call him as an impeachment witness, McKay's opinions about Polan's investigation amounted to little more than speculation. McKay admitted on cross-examination that he was unaware of the actual availability of the witnesses who testified at the habeas trial, how their stories may have differed from their accounts at the time of trial, or "what kind of baggage" those witnesses may have had that would have weighed against calling them as witnesses at the criminal trial.

### E

Turning to our consideration of the totality of evidence presented at the habeas trial regarding Polan's investigative efforts to discover witnesses necessary to support the petitioner's assertion that he acted in self-defense, we cannot agree on the basis of our plenary review of the record that the petitioner met his burden of demonstrating that Polan's investigation in this case or her decision not to call Jones or other available witnesses known to her necessarily constituted deficient performance. Our review of the habeas court's memorandum reveals that the habeas court made its finding of an inadequate investigation without reference to or analysis of the facts regarding the investigative efforts actually taken or not taken by Polan or her investigator. In fact, the habeas court does not discuss those efforts and makes no relevant subordinate findings. Rather, it appears that the habeas court reached its conclusion of ineffective assistance largely on the basis of its finding that the "witnesses who testified at the habeas trial were credible, both individually and collectively." The court concluded on the basis of this credibility determination that it lacked "confidence in the outcome of the jury trial."

In so concluding, however, the habeas court appears to have addressed the prejudice prong without having

first made a determination that counsel's representation was deficient. Indeed, the habeas court's finding that the testimony of the habeas witnesses was credible and that these witnesses could have lent additional support to the petitioner's claim of self-defense, puts the cart before the horse and does not squarely address the issue of deficient performance, i.e., whether Polan's failure to call these credible witnesses was fairly attributable to a constitutionally deficient investigation or whether, if aware of a particular witness, she lacked any reasonable strategic reason for proceeding in the manner that she did. Instead, the conclusion that these witnesses would have been helpful to the petitioner's self-defense claim pertains, more directly, to prejudice. Although a habeas court certainly may *reject* a claim of ineffective assistance by addressing whichever prong of the analysis is easier, in order to conclude that a habeas petitioner has succeeded with respect to such a claim, it must engage in an independent consideration of both prongs, each of which must be satisfied independently. See *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 669, 159 A.3d 1112 (2017); see also *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 5, 188 A.3d 1 (2018) (to establish ineffective assistance, petitioner must establish *both* that counsel's failure to secure evidence was "constitutionally inexcusable" *and* that proven deficiency "undermines confidence in the reliability of the petitioner's conviction"), cert. denied, U.S. , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019). Here, the habeas court appears to have employed the type of "hindsight" and after-the-verdict second-guessing of counsel that *Strickland* expressly warns against. See *Strickland* v. *Washington*, supra, 466 U.S. 689.

Although "trial counsel's testimony is not necessary to [a] determination that a particular decision might be considered sound trial strategy"; *Bullock* v. *Whitley*, 53 F.3d 697, 701 (5th Cir. 1995); "[a] habeas petitioner's failure to present trial counsel's testimony as to the strategy employed at a petitioner's criminal trial hampers both the court at the habeas trial and the reviewing court in their assessments of a trial strategy." *Franko* v. *Commissioner of Correction*, 165 Conn. App. 505, 519, 139 A.3d 798 (2016). In such circumstances, a habeas court "must examine all other available evidence from the trial record in order to determine whether the conduct complained of *might be* considered sound trial strategy." (Emphasis added.) Id.

As indicated by the United States Court of Appeals for the Fifth Circuit in *Bullock*, it is not necessary for a reviewing court to resolve what strategic decisions defense counsel *actually* made, but it is "required to presume that the challenged actions were within the wide range of reasonable professional conduct if, under the circumstances, it *might have been* sound trial strategy." (Emphasis added; internal quotation marks omitted.) *Bullock* v. *Whitley*, supra, 53 F.3d 701. The peti-

tioner has the burden to overcome that presumption of reasonable professional conduct; id.; and Polan's death did not relieve the petitioner of the substantial burden of demonstrating that Polan's representation was less than constitutionally competent. See *Slevin* v. *United States*, supra, 71 F. Supp. 2d 358 n.9.

Therefore, as the respondent correctly argues, it was the petitioner's burden to show that Polan did *not* attempt to investigate various witnesses' accounts of the shooting. Polan was not available to testify about the investigation, and the petitioner was unable to elicit any relevant details from Polan's investigator, O'Donnell, about the efforts Polan or he took to locate and interview witnesses. Although it may be true that O'Donnell's testimony was of minimal utility because he asserted that he had virtually no memory of the investigation, this did not shift the burden to the respondent to prove an adequate investigation. In the absence of any evidence to overcome the strong presumption that Polan had engaged in an objectively reasonable investigation, it was improper for the habeas court to have speculated that the witnesses who testified at the habeas trial were not known to Polan[14] or that she had elected not to call them on the basis of anything other than a reasonable strategic choice.

Furthermore, because counsel is presumed to have acted reasonably in the absence of evidence to the contrary, without any evidence of Polan's trial strategy, the habeas court was required to consider whether there was *any* plausible reason for not calling the various witnesses. The habeas court's memorandum is silent with respect to possible rationales for limiting the investigation or not calling certain witnesses.

Rather, the habeas court observed that it had "no evidence directly from Polan about any of her trial strategies and the tactical decisions she made to accomplish them." This would include her investigative strategy. The petitioner had the burden of establishing that Polan's investigation fell outside the wide range of professional conduct considered reasonable, but such evidence is lacking here. Judging the reasonableness of investigative efforts "depends critically" on the information that counsel receives from her client. See *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681. Here, the petitioner testified at the habeas trial that he had made Polan aware of several witnesses, including Jymisha, Wright, Walker, and Jones. His testimony, however, offered no insight as to whom Polan or O'Donnell actually had interviewed, whether the defense team had knowledge of witnesses' potential testimony from their review of police records or discussions with the prosecutors or other witnesses, or whether Polan decided that she effectively had gathered the factual basis for the defenses she sought to pursue through the testimony of the state's trial witnesses.

Polan indisputably pursued a self-defense claim at trial in the present case. The petitioner concedes that Polan properly requested and received a jury instruction on self-defense, and a review of the trial transcript shows that she spent a portion of her closing argument attempting to persuade the jury that the petitioner had fired his weapon in self-defense. Furthermore, the self-defense case that Polan presented at the criminal trial was not markedly different than the one the petitioner advanced at the habeas trial. Polan was able to argue on the basis of the evidence presented at the criminal trial, largely through the state's own witnesses, that the petitioner fired his weapon toward the victim, whom he had reason to believe was armed, only after hearing a gunshot fired by an unknown person. The only additional information pertaining to self-defense that a jury could have gleaned from the habeas trial witnesses' testimony that was not presented at the criminal trial was that it was highly likely that the victim had, in fact, been armed at the time he was shot, because multiple witnesses either saw him with a gun before he was shot or saw someone remove a gun from near his body after he was shot. As the respondent persuasively argues, however, these additional facts, even if presented to the jury, would only be marginally relevant to the petitioner's self-defense claim because "it was the reasonableness of the *petitioner's* subjective perception of the situation, as *he* saw it, not the perception of the other witnesses, that was relevant to the issue of self-defense." In other words, Polan did not need to demonstrate that the victim in fact had a gun, only that the petitioner reasonably believed him to be armed.

Finally, it must be noted that Polan's overall performance included presenting a defense that resulted in the petitioner's acquittal of murder, the most serious charge he was facing. The United States Supreme Court has observed that "while in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial . . . it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." (Citation omitted; internal quotation marks omitted.) *Harrington* v. *Richter*, 562 U.S. 86, 111, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). It is hard to label Polan's efforts on behalf of the petitioner as ineffective advocacy when those efforts resulted in a significant reduction in the petitioner's potential sentencing exposure through his acquittal on the murder charge. If the petitioner had been convicted of murder, he faced a sentence ranging from the mandatory minimum of twenty-five years to a maximum of life in prison. See General Statutes § 53a-35a (2). Instead, his manslaughter with a firearm conviction carried a lesser penalty, a five year mandatory minimum with a maximum sentence of forty years of incarceration. General Statutes § 53a-35a (5).

On the basis of our plenary review of the record presented to the habeas court, we conclude that, without resorting to impermissible speculation, the record contains insufficient evidence from which to gauge whether Polan employed reasonable efforts to investigate the shooting to locate relevant witnesses in support of the petitioner's self-defense claim or whether she had strategic reasons for deciding not to call a particular witness to testify at trial.[15] Because the petitioner has the burden of proof, that evidentiary lacuna must be resolved in favor of the respondent.

Because we agree with the respondent that the habeas court improperly determined that Polan provided deficient performance with respect to the petitioner's self-defense claim, we need not address the respondent's additional argument that the habeas court also improperly determined that the petitioner proved prejudice relative to the issue of self-defense. Because, however, the habeas court's decision to grant the petition for habeas corpus was also founded on Polan's alleged ineffective assistance in failing to pursue a third-party culpability defense, we turn to the respondent's next claim.

### III

The respondent also claims that the habeas court improperly determined that Polan rendered deficient performance because she failed to pursue a third-party culpability defense. Specifically, the respondent claims that the court improperly relied on its own opinion regarding the viability of a third-party culpability defense centered on the victim's brother, Mookie, rather than entertaining the possibility that a competent attorney, after careful consideration of the law and available evidence, reasonably might have disagreed with the habeas court's assessment and considered the theory either too weak to present to a jury or having the potential to muddy or otherwise undermine the defense that she chose to pursue, which ultimately resulted in an acquittal on the most serious charge of murder. We agree with the respondent that, in light of the record presented, which, despite not seeking a third-party culpability instruction, includes the undisputed fact that Polan argued to the jury the possibility that the victim was killed by a bullet fired by someone other than the defendant, the habeas court improperly determined that Polan had provided ineffective assistance with respect to a third-party culpability defense.

We begin with a brief review of the standards governing the admissibility of third-party culpability evidence and the requirements that must be met to obtain an instruction on third party culpability. "It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been

charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . .

"The admissibility of evidence of [third-party] culpability is governed by the rules relating to relevancy. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination." (Citations omitted; internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 514–15, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

"It is not ineffective assistance of counsel . . . to decline to pursue a [third-party] culpability defense [if] there is insufficient evidence to support that defense." Id., 515; see also *Dunkley* v. *Commissioner of Correction*, 73 Conn. App. 819, 826–27, 810 A.2d 281 (2002), cert. denied, 262 Conn. 953, 818 A.2d 780 (2003). Furthermore, even if a witness' testimony might have supported a third-party culpability defense, this court on other occasions has concluded that defense counsel did not engage in deficient performance by failing to raise the defense or to call witnesses to testify in instances in which jurors likely would have found the testimony unreliable, inconsistent, or unpersuasive in light of the state's evidence against the petitioner. See, e.g., *Floyd* v. *Commissioner of Correction*, 99 Conn. App. 526, 531–32, 914 A.2d 1049 (testimony of drug dealers/gang members insufficient to render counsel's failure to raise third-party culpability claim deficient performance), cert. denied, 282 Conn. 905, 920 A.2d 308 (2007); *Daniel* v. *Commissioner of Correction*, 57 Conn. App. 651, 684, 751 A.2d 398 (failure to raise third-party culpability defense did not constitute deficient performance because inconsistent testimony regarding identity of third party), cert. denied, 254 Conn. 918, 759 A.2d 1024 (2000).

The following additional facts are relevant to this claim. At trial, there was uncontested evidence that, shortly before the petitioner fired his weapon at the victim, someone nearby, other than the petitioner, had fired a shot. Williams' testimony at trial suggested that the shooter was Wright, although other witnesses testified that Wright was not present when the first shot was fired. As previously indicated, Jones had provided

the defense with a statement suggesting that Mookie had fired the first shot. The medical examiner testified at trial that the bullet that killed the victim had entered his skull at a point behind his ear and exited through his forehead. The evidence was uncontested that the petitioner was standing directly in front of the victim just prior to him firing his gun.

Here, although Polan did not request a specific instruction on third-party culpability, she nevertheless strongly argued the essence of such a defense to the jury. Accordingly, we reject any notion that she failed to pursue the defense outright. In her closing argument, Polan effectively attempted to shift blame away from the petitioner and toward a third-party assailant by arguing to the jury on the basis of the forensic evidence presented that there was reasonable doubt that the bullet that killed the victim was fired by the petitioner. Specifically, she highlighted the fact that the bullet that killed the victim had entered the skull from behind the victim's right ear whereas all the witnesses had placed the petitioner standing directly in front of the victim at the time the victim was shot. If the jury believed that theory, or if it had created reasonable doubt in the jury's mind about the identity of the shooter, it could have resulted in an acquittal irrespective of whether Polan elected to request an instruction to the jury regarding third party culpability.

Moreover, there are a number of possible reasons why Polan may have chosen to present the third-party culpability defense in the manner that she did, including choosing to forgo seeking a third-party culpability instruction from the court. Polan reasonably might have believed that it would be easier to establish, on the basis of the forensic evidence, reasonable doubt as to whether the bullet that killed the victim had been fired by the petitioner rather than attempting to satisfy the more rigid requirements necessary for entitlement to a third-party culpability instruction. See *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 515 (evidence of "direct connection between a third party and the charged offense" necessary for instruction on third-party culpability). Instead, she reasonably could have determined that, even in the absence of an instruction, she effectively could argue to the jury that an unidentified third person caused the death of the victim rather than the petitioner. That strategy could have been particularly compelling in a case like the present one in which there were conflicting witness accounts of who was present, who was armed, and who may have fired a shot.

Polan also reasonably may have believed that the third-party culpability defense was weaker than the petitioner's self-defense claim, and that, even if she were able to convince the court to give an instruction on third-party culpability, it may have unnecessarily

distracted the jury from what she believed were more compelling arguments. The state, after all, had strong evidence to counter a third-party culpability narrative. All the witnesses testified that the victim did not fall to the ground until after the petitioner fired his gun, suggesting it was his shot, and not the first shot fired, that struck and killed the victim. Furthermore, Stevenson, Williams and the petitioner himself testified at the criminal trial that the victim had begun to turn or move away from the petitioner at the time the petitioner fired his gun, which could have explained away the forensic evidence that was central to the success of any third-party culpability claim. Thus, although not abandoning it completely, Polan chose not to make it more of a focus of her closing argument and risk confusing or alienating the jury.

Finally, as we have discussed already with respect to the petitioner's self-defense claim, specific evidence of Polan's reasons for pursuing or not pursuing any particular defense strategy—something generally obtained at the habeas trial through the testimony of trial counsel or someone directly familiar with her strategy—was utterly lacking. Ordinarily, such evidence is crucial to meet the high hurdle imposed on a petitioner to show that his counsel's exercise of professional judgment fell outside the wide range considered competent for constitutional purposes. See *O'Neil* v. *Commissioner of Correction*, 142 Conn. App. 184, 190–91, 63 A.3d 986 (lack of testimony by defense counsel about strategy was factor in determining petitioner failed to meet burden of demonstrating deficient performance), cert. denied, 309 Conn. 901, 68 A.3d 656 (2013). Like the claim of ineffective assistance regarding self-defense, because the petitioner bears the burden of demonstrating that counsel's representation was deficient, the habeas court was required to consider whether Polan's decision not to pursue a formal third-party culpability instruction might be viewed as a reasonable strategic decision under the facts and circumstances of this case as viewed from the position of counsel at the time of the decision. The habeas court failed to conduct this inquiry and made no relevant factual findings.

To summarize, we agree with the respondent that the habeas court, in analyzing whether Polan's performance fell outside the wide range of competent performance, failed affirmatively to entertain whether Polan properly had weighed the pros and cons of various trial strategies and chose to defend the petitioner in a manner different than the strategy the habeas court thought she should have pursued. Although the death of counsel arguably made the petitioner's case more difficult to prove than it might otherwise have been, that unfortunate reality does not lessen the petitioner's significant burden. Because the petitioner was unable, due to a lack of evidence, to negate all possibility that Polan engaged in a reasonable, albeit only partially successful, defense

strategy on the record available, he failed to meet his burden and the habeas court should have denied his petition for a writ of habeas corpus.

The judgment is reversed and the case is remanded with direction to deny the petition for a writ of habeas corpus.

In this opinion the other judges concurred.

[1] Specifically, the court sentenced the petitioner to the maximum permitted sentence of five years of imprisonment on the weapons charge, a class D felony; see General Statutes §§ 29-37 (b) and 53a-35a (8); which was ordered to run consecutively to the forty year maximum sentence of incarceration that the court imposed for the manslaughter charge. See General Statutes § 53a-35a (5).

[2] In particular, this court concluded that the prosecutor improperly had argued to the jury that the jury could infer the defendant's intent from the "extra effort" and "more conscious action" it takes to fire a revolver rather than a semiautomatic pistol because the state's firearms expert never testified to those particular facts. *State* v. *Jordan*, supra, 117 Conn. App. 166. This court also concluded that, under the circumstances presented, the prosecutor's repetitive use of the rhetorical phrase "doesn't it offend your common sense" was improper. Id., 167. Despite those improprieties, however, this court determined on the basis of our analysis of the various factors set forth in *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987), that the defendant was not deprived of his right to a fair trial. See *State* v. *Jordan*, supra, 168–70.

[3] The habeas court permitted the petitioner to withdraw the two prior habeas petitions without prejudice, both times just before the start of a trial on the merits. The petitioner also filed a fourth habeas petition subsequent to the present petition in which he alleged that the respondent had entered into, and subsequently breached, an agreement to award him certain earned risk reduction credits. That fourth petition was dismissed by the habeas court. See *Jordan* v. *Commissioner of Correction*, 190 Conn. App. 557, 558, 211 A.3d 115 (affirming judgment of habeas court on ground that petition had failed to implicate cognizable liberty interest sufficient to invoke subject matter jurisdiction of habeas court), cert. denied, 333 Conn. 905, 215 A.3d 159 (2019).

[4] See *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[5] The respondent also raised the defense of abuse of the writ. In support of that defense, the respondent asserted that the petitioner raised the same issues in the current habeas petition that he had raised in two prior petitions, each of which he had withdrawn on the day trial was scheduled to commence, purportedly due to the unavailability of witnesses. "Decisions concerning abuse of the writ are addressed to the sound discretion of the trial court." *James L.* v. *Commissioner of Correction*, 245 Conn. 132, 143, 712 A.2d 947, 953 (1998); see id., 140 n.8 (noting that successive petitions are not necessarily abuse of writ but declining to "delineate how these two habeas doctrines differ or overlap"). The respondent did not pursue the abuse of the writ defense in his posttrial brief, and the habeas court did not address that defense in its decision on the merits. Because the respondent has not raised abuse of the writ as an issue on appeal, we deem it abandoned.

[6] As part of his preliminary papers on appeal, the petitioner raised as an alternative ground for affirmance pursuant to Practice Book § 63-4 (a) (1) that the habeas court also should have granted the petition on the basis of Polan's having allowed her chief investigator, O'Donnell, to assist her at counsel table during the trial. The habeas court had found that Polan's decision to allow O'Donnell to sit at counsel table was unreasonable as a defense strategy and, thus, amounted to deficient performance, because, as a result of the criminal court's sequestration order, Polan was precluded from calling O'Donnell to impeach a witness who testified at trial inconsistently with a pretrial statement made to O'Donnell. The habeas court, however, concluded that the petitioner had failed to demonstrate that he was unduly prejudiced by Polan's decision. Because the petitioner did not brief this alternative ground for affirmance in his appellee's brief, we deem it abandoned. See *State* v. *Rowe*, 279 Conn. 139, 143 n.1, 900 A.2d 1276 (2006).

[7] The respondent filed a petition for certification to appeal on October 15, 2018. The habeas court initially denied the petition on October 16, 2018, without explanation. In response to that ruling, the respondent filed a motion

for articulation asking the court to state the basis for its denial of the petition for certification. In that motion, the respondent sought to excuse any perceived delay in the filing of the petition by noting that counsel for the respondent had been out of the country, that counsel was informed by the clerk's office that it measured the ten day filing period governing petitions for certification to appeal as set forth in General Statutes § 52-470 (g) by counting business days, not calendar days (which would mean the October 15, 2018 petition was timely filed), and that counsel filed the petition immediately after returning to the office. The habeas court, in response to the motion for articulation, issued an order on October 25, 2018, vacating its prior order and granting the respondent's petition for certification to appeal. The court explained that, although, in its view, it properly had interpreted the ten day statutory filing deadline to mean ten calendar days, it nonetheless had reconsidered its earlier ruling in light of the facts set forth in the motion for articulation and because the time period for filing a petition for certification to appeal is not jurisdictional in nature. See *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689, 700, 699 A.2d 1003 (1997) (holding that whether to entertain untimely petition for certification fell within court's discretion, to be exercised after considering reasons for delay).

[8] "[T]he state and federal constitutional standards for review of ineffective assistance of counsel claims are identical" and the rights afforded are "essentially coextensive" in nature and, thus, do not require separate analysis. (Internal quotation marks omitted.) *State* v. *Drakeford*, 261 Conn. 420, 431, 802 A.2d 844 (2002), citing *State* v. *Fernandez*, 254 Conn. 637, 652, 758 A.2d 842 (2000), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001).

[9] Because we determine on the basis of our plenary review that the petitioner failed to satisfy his burden under the performance prong of *Strickland*, it is unnecessary for us to reach the respondent's claim that the petitioner also failed to satisfy the prejudice prong. See *Antwon W.* v. *Commissioner of Correction*, supra, 172 Conn. App. 858.

[10] The criminal trial court's detailed instructions to the jury on self-defense included the following instructions pertaining to the initial aggressor exception to self-defense as well as the statutory duty to retreat. "The initial aggressor is the person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used upon that other person. The first person to use physical force is not necessarily the initial aggressor.

"Before an initial aggressor can . . . use any physical force, the initial aggressor must withdraw or abandon the conflict in such a way that the fact of withdrawal is perceived by his opponent so that such opponent is aware that there is no longer any danger from the original aggression.

"If the initial aggressor so withdraws or abandons the conflict and his opponent not withstanding continues or threatens the use of physical force, the initial aggressor may be justified in using physical force to defend himself.

"If you find that the state has proven beyond a reasonable doubt that the defendant was the initial aggressor and that the defendant did not effectively withdraw from the encounter or abandon it in such a way that his opponent knew he was no longer in any danger from the defendant, you shall then find the defendant was not justified in using any physical force.

* * *

"[A] person is not justified in using deadly physical force upon another person if he knows he can avoid the necessity of using such force by retreating with complete safety. This means that retreat was both completely safe . . . and available and that the defendant knew it.

"Completely safe means without any injury to him whatsoever. As I have said, self-defense requires you to focus on the person claiming self-defense, on what he reasonably believed under the circumstances, and it presents a question of fact as to whether a retreat with complete safety was available and whether the defendant knew it.

"The law stresses that self-defense cannot be retaliatory. It must be defensive and not punitive. So you must ask yourself, did the defendant know he could avoid the use of deadly force by retreating with complete safety? If so and yet he chose to pursue the use of deadly force then you shall reject that self-defense claim."

[11] We note that the state's theory of the case did not turn on the identity of who fired the first shot. Williams' trial testimony implicated Wright without directly identifying him as the shooter, whereas at least one of the habeas witnesses indicated that the first shooter was Mookie.

[12] Neither the transcript of Martin's statement nor the tape recording itself,

both of which were admitted as full exhibits at the criminal trial, was submitted as an exhibit at the habeas trial and, thus, any review of the contents of Martin's statement is limited to that portion described on the record at the criminal trial.

[13] Jones' story corroborated in some respects Williams' trial testimony that other participants, including the victim, were armed and that weapons had been drawn before the victim was shot. Her testimony, if believed, also helped corroborate the petitioner's own testimony that he fired because he feared for his life.

[14] Our review of the record would support an inference that Polan was aware of several of the witnesses. For example, both Jones and Jordan testified at the habeas trial that they had spoken with Polan or O'Donnell.

[15] In *Skakel*, our Supreme Court concluded that defense counsel provided ineffective assistance by failing to call an additional alibi witness, who, unlike the witnesses called at trial to support the defendant's alibi defense, was unrelated to the defendant and, thus, a neutral and disinterested witness. See *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 54. Here, none of the witnesses presented at the habeas trial could be described as neutral or disinterested. They were either related to or friends with the petitioner and/or the victim.

––––––––––––––––––––––––––––––